United States Court of Appeals,

Eleventh Circuit.

No. 97-9381.

Christine LOPS, Petitioner-Appellee,

v.

Michael LOPS, Anne E. Harrington, Respondents-Appellants.

May 7, 1998.

Appeal from the United States District Court for the Southern District of Georgia. (No. 1:97-CV-298), Dudley H. Bowen, Jr., Judge.

Before COX and HULL, Circuit Judges, and KRAVITCH, Senior Circuit Judge.

HULL, Circuit Judge:

Petitioner-Appellee Christine Lops filed a petition under the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601-10, seeking return of her two minor children to Germany. After conducting evidentiary hearings, the district court found that Petitioner's former husband, Respondent Michael Lops, and his mother, Respondent Anne Harrington, wrongfully removed Petitioner's minor children from Germany to the United States in violation of Petitioner's custody rights. As authorized under ICARA, the district court ordered the children's return to Germany with Petitioner. Respondents appeal. After review, we affirm.

I. FACTS

The issues in this appeal necessitate first a detailed review of the district court's findings of fact and the evidence supporting them.

A. *On January 31, 1995, Petitioner Initiates Divorce And Custody Proceedings In Germany*

Petitioner and Respondent Lops were married in Germany in June 1991. Until they separated in January 1995, they lived with their two minor daughters, Claire and Carmen Lops, in

Rodgau, Germany. On January 31, 1995, Petitioner initiated divorce and custody proceedings in the German family court for the district that was the marital and habitual residence of the parties. Alleging that Respondent Lops physically abused her, Petitioner sought sole custody of the children. From January 1995 to early May 1995, Petitioner and the children visited relatives and friends in Belgium.

On May 2, 1995, Petitioner and Respondent Lops appeared with counsel for their first hearing before the family court in Germany. Respondent Lops also sought sole custody of the children. Since the parties could not reach a custody agreement, Judge Rudolf Giwitz, the German family court judge, instructed the parties to appear with the children the following week. Even though Petitioner had returned to Germany with the children in early May 1995, the animosity between Petitioner and Respondent Lops had increased due to Petitioner's taking the children to Belgium for four months without Respondent Lops's consent.

B. *On May 10, 1995, Parties Agree To Share Custody At German Family Court Hearing*

On May 10, 1995, the parties appeared again with counsel and the children before Judge Giwitz. At this "isolated proceeding of custody" hearing under German law, Judge Giwitz heard from each party and interviewed the children. In a letter written from Judge Giwitz to the district court, Judge Giwitz indicated that Petitioner expressed concerns that Respondent Lops would follow through on earlier threats to abduct the children and take them to the United States. Judge Giwitz's letter further states that Respondent Lops dispelled these concerns by arguing that he was firmly rooted in Germany and had no further connection with the United States.[1]

---

[1]Judge Giwitz's correspondence and all of the German courts' orders, and their English translations, were entered in the record at the evidentiary hearing. After observing that the German documents were translated by Petitioner's German counsel, a partisan individual, the district court noted that a neutral translator subsequently had affirmed that the translations were accurate in most respects.

As a result of the German family court proceeding, the parties agreed to share joint legal custody, with Petitioner retaining primary physical custody. Respondent Lops was allowed visitation rights based on his assurance to Judge Giwitz that he would return the children to Petitioner.

The parties' agreement regarding custody of the children resulted in a suspension of the German family court proceedings. Judge Giwitz approved of Respondent Lops's having a short visitation with the children immediately following the hearing, with the understanding that Respondent Lops would return the children that evening to Petitioner. The German court considered the parties' custody agreement announced in court as binding on both parties.

C. *On May 10, 1995, Respondent Lops Violates Custody Agreement*

Immediately following the May 10 hearing, Respondent Lops visited with the children as authorized by Judge Giwitz. Once Respondent Lops obtained the children physically, he did not return the children to Petitioner as agreed, and understood by Petitioner and Judge Giwitz, only hours earlier. Petitioner objected and initiated efforts to contest this unilateral alteration of the parties' agreement announced before Judge Giwitz.

Over the next two weeks, Petitioner resided with Respondent Lops's aunt and visited the children daily in the marital residence, but she was never allowed to remain alone with the children. During this time, there was also some attempt at marital reconciliation, which soon failed.

D. *On May 30, 1995, Respondents Fraudulently Obtain New Passports For The Children*

Unbeknownst to Petitioner, Respondents planned to remove the children from Germany, but could not because the children's passports were in Petitioner's possession. The district court determined that Respondents misrepresented to Consulate officials that Petitioner had abandoned the children and thereby obtained new passports for the children on May 30, 1995. The district court

expressly found, and the evidence showed, that Petitioner never abandoned the children and that she had parental custody rights not only by operation of German law but also by the agreement before and approved by the German family court judge.

E. *On May 30, 1995, Petitioner Reopens Custody Proceedings In German Family Court, And On June 1, 1995, Respondent Lops Takes Children From Germany To Spain*

On May 30, 1995, the same day Respondents obtained new passports for the children, Petitioner reopened the suspended custody proceedings before Judge Giwitz. However, on June 1, 1995, without Petitioner's knowledge or consent and in violation of the parties' custody agreement in Judge Giwitz's court, Respondent Lops took the children from Germany to Spain, where they stayed until approximately June 25, 1995. While Respondent Lops and the children were in Spain, Respondent Harrington, Respondent Lops's mother, remained at the former marital residence in Rodgau, Germany.

F. *On June 27, 1995, Respondent Harrington Takes Children To The United States*

Respondent Lops and the children returned to Germany on June 25, 1995. Only two days later, Respondent Harrington took the children to the United States, without Petitioner's knowledge or consent and in violation of her custody rights under German law and the parties' custody agreement in Judge Giwitz's court.

G. *On July 3, 1995, German Family Court Conducts Another Hearing*

Judge Giwitz held another custody hearing on July 3, 1995. Neither Respondent Lops nor his counsel revealed to the German family court, or Petitioner, that his mother, Respondent Harrington, had already taken the children to the United States, or that Respondent Lops was packing his furniture and belongings to leave for the United States only days later.

H. *On July 8, 1995, Respondent Lops Joins Children In The United States But Conceals Whereabouts*

On July 8, 1995, Respondent Lops left for the United States. Initially, Respondent Lops and the children stayed with Respondent Harrington in her home in Martinez near Augusta, Georgia. In early August 1995, Respondent Lops and the children moved into a home purchased by Respondent Harrington across Georgia's border in North Augusta, South Carolina. The district court described the transaction for "this curiously purchased house" as "peculiar." The purchase contract called for a down payment and a twenty-year mortgage, but Respondent Harrington was not to receive an executed deed to the home for twenty years. Instead, the seller of the home remained its owner, and the lender held the deed from the seller to Respondent Harrington. The deed was to be transferred to Respondent Harrington only after all of the mortgage payments were made. Thus, the title to the South Carolina home apparently remained in the seller, arguably concealing its true ownership.

The district court found that over the next two and one-half years Respondent Lops and his mother, Respondent Harrington, took other more significant measures to conceal his and the children's whereabouts from Petitioner. For example, Respondent Lops had no checking account and personally transacted business only in cash, including at times the children's private school tuition.[2] Respondent Lops drove a $30,000 van registered under Respondent Harrington's name. Despite the fact that he earned an annual six-figure income as a foreign exchange broker in Germany, Respondent Lops did not obtain any employment in the United States, which would have required him to disclose his social security number. Instead, he worked as a part-time independent contractor with House Rentals owned by his stepfather, Wayne Harrington. Respondent Lops, Mr. Harrington, and Mr. Harrington's company did not have any real estate licenses.

---

[2]Evidence before the district court revealed that while Respondent Lops made some payments in cash, Respondent Harrington made most tuition payments by check.

Respondent Lops never reported any income or paid any federal or state income taxes in the United States during 1995, 1996, or 1997. In short, Respondent Lops had no "electronic identity." As the district court aptly noted in its findings of fact:

> Mr. Lops has no conventional credit, no credit cards, engages only in cash transactions; pays no utilities; his mother takes care of those; has no lease with his mother. This is a curious existence....

Notwithstanding his significant income reduction, Respondent Lops maintained a comfortable lifestyle, reportedly by borrowing from friends and family; yet, no loans had any documentation. Although living and driving in South Carolina for over two years, Respondent Lops never obtained a South Carolina driver's licence, nor did any insurance policy list Respondent Lops as an authorized driver of the van. The district court's findings of fact concluded:

> ... I see Mr. Michael Lops in a situation or in a position or pattern of continuing deception and even if every word that he says about his income and his business affairs is to be believed he is committing either four or five misdemeanors to maintain this pattern and to conceal, at least himself, from any authority.

I. *On August 31, 1995, German Court Issues A "Certificate Of Unlawfulness," And Then Petitioner Files A Request For Return Of Children Under Hague Convention*

While Respondent Lops concealed his and the children's whereabouts in South Carolina, the German court proceedings continued unabated. Although Respondent Lops was never present in court, his counsel was. After a hearing on August 31, 1995, attended by Respondent Lops's attorney, the German court issued a "Certificate of Unlawfulness." The "Certificate of Unlawfulness" found that Respondent Lops had not returned the children following a period of visitation, "contrary to the Agreement settled in the presence of the Family Judge." In that Certificate, the German court further found that Respondent Lops violated Petitioner's custody rights and was acting unlawfully. Likewise, the district court also found that "Respondents removed the children from the country of their habitual residence in breach of custody rights which Petitioner was actually exercising at the

time of removal."

In September 1995, Petitioner filed a "Request for Return" of the children under the Hague Convention with the Central Authority in Germany.

J. *On September 26, 1995, German Family Court Awards Petitioner Temporary Sole Custody Of The Children*

On September 26, 1995, Judge Giwitz conducted another custody hearing. Respondent Lops's attorney again appeared and contended that Petitioner should not have sole custody of the children due to her own misconduct and that the German court lacked jurisdiction. Since the children had lived in Germany with their parents since birth, Judge Giwitz's September 26 order rejected Respondent Lops's contentions and determined that Germany was the state of habitual place of residence and that the German court had jurisdiction.

The district court found that the orders of the German courts regarding custody were valid and further showed that Respondent Lops had violated Petitioner's custody rights. In the September 26, 1995 order, Judge Giwitz recited the history of the case, including the parties' agreement announced before him on May 10, 1995. Judge Giwitz's order specifically found that Petitioner had been the most important person in the children's lives, that the children had developed well in the care of their mother, and that Petitioner was able to educate the children. In contrast, Respondent Lops's behaviors, including his misrepresentations to the court and violations of the parties' custody agreement, persuaded Judge Giwitz to find in his September 26 order that Respondent Lops was concerned more with his own interests than the children's welfare, and, that Respondent Lops was not able to educate the children properly. Consequently, the German family court awarded Petitioner sole temporary custody of the children. Respondent Lops's attorney appealed Judge Giwitz's order.

K. *On January 11, 1996, German Appellate Court Affirms Grant Of Custody To Petitioner*

On January 11, 1996, a German appellate court affirmed Judge Giwitz's temporary grant of sole custody to Petitioner, holding that the children's habitual residence was Germany. On January 18, 1996, Petitioner petitioned the German family court for a final divorce and permanent custody. On October 7, 1996, the German family court pronounced final judgment awarding Petitioner a final divorce and permanent sole custody of both children.

L. *In August 1996, Respondent Lops Initiates Divorce Action In South Carolina*

Despite the German appellate court's affirming Judge Giwitz's award of custody to Petitioner and his counsel's participating in the German court proceedings, Respondent Lops filed a divorce action in August 1996 in the Family Court of Aiken County, South Carolina. Respondent Lops claims that he attempted service upon Petitioner by mailing papers to her last known German address and that Petitioner failed to respond. Petitioner denies ever receiving them. On September 20, 1996, the South Carolina court entered a pendente lite order pursuant to the Uniform Child Custody Jurisdiction Act based on the residence of Respondent Lops and the children. The South Carolina court's order awarded Respondent Lops sole temporary custody of the children pending final hearing on the divorce, and held "[a]ll other issues relating to property, visitation, support and the divorce itself" in abeyance until a final hearing on the merits.

The district court made no findings of fact about what actually happened in this South Carolina divorce action, but rather considered the prior German court orders valid and controlling as to the habitual residence of the children in 1995 and as to who had custody at the time of the removal of the children from Germany. Indeed, the South Carolina divorce action never proceeded to final judgment, while the German divorce and custody action did. Also, the German appellate court affirmed the German family court's award of custody to Petitioner before Respondent Lops initiated the South Carolina divorce action. The district court did not err in giving priority to the

German court's orders and final judgment in deciding that Petitioner had custody of the children at the time of Respondents' removal of the children from Germany to the United States.[3]

M. *Petitioner's Two-Year Efforts To Locate Children*

The record is replete with evidence of Petitioner's two-year campaign to locate her children. For example, the district court found that from 1995 to 1997 Petitioner employed the assistance of approximately eleven state, national, and international agencies, including Interpol, the United States State Department, and the Georgia Bureau of Investigation ("GBI"). These agencies searched records (1) in Georgia, where Respondent Harrington lives; (2) in Virginia, where Respondent Lops's sister lives; and (3) in New York, where Respondent Lops's adoptive father lives.

The GBI conducted drive-by checks at Respondent Harrington's home. The GBI contacted local school officials and checked credit and employment tax records. These and many other concerted efforts, including the State Department's initiating database searches such as credit agency reports and the Federal Parent Locator Service, were to no avail. One memo, dated August 9, 1996, from "Interpol Washington" to "Interpol Wiesbaden" in Germany is illustrative of the agencies' efforts:

> Begin message: At the present time, we cannot locate Mr. Michael Raymond Lops and the two children, Carmen and Claire, anywhere in the State of Georgia. The two girls have not been enrolled in school and no sighting has been made of them at their Grandmother's house in Martinez, Georgia. Several checks have been made on Mr. Lops [sic] Social Security

---

[3]The divorce action in the South Carolina court subsequently was stayed in February 1998 pending the outcome of the appeal in this case. Also, we could not locate a final custody or divorce decree by the South Carolina court in the record. Instead, a South Carolina court order, dated January 28, 1998, states that regarding "the action for Divorce which is pending in this court ..., regardless of previous service, Chistiane [sic] Lops ... [was] served with the Summons and Complaint on January 6, 1998 .... [t]he last day for answering or otherwise responding to the Complaint will be February 5, 1998." This further indicates that the South Carolina divorce action has not proceeded to final judgment.

Number in 1995 and again in 1996 but all were negative.[4]

Additionally, the district court noted that there was disputed evidence that Respondent Harrington was contacted by officials in December 1996, but denied knowing the whereabouts of the children. A memo, dated December 12, 1996, from the United States National Central Bureau to the Diplomatic Security Service of the Department of State, states as follows:

> Incidentally, Lops' mother, who resides in Martinez, Georgia, refuses to admit knowing where [Respondent Lops] and the children can be found. I can locate no other trace as to their current whereabouts.

Ultimately, officials contacted the District Attorney's office in Georgia's Augusta Judicial Circuit, where Respondent Harrington lives. The District Attorney's office received authorization from the Superior Court of Columbia County, Georgia, also located in the Augusta Judicial Circuit, to place a wiretap on Respondent Harrington's telephone. Through wiretaps, officials ascertained the whereabouts of Respondent Lops and the children, as well as when the children would be at Respondent Harrington's home in Georgia.

On November 3, 1997, as a result of the GBI's requesting custody of the children, the Superior Court of Columbia County, Georgia issued an order directing law enforcement to seize the children and surrender custody to the Georgia Department of Family and Children Services ("DFACS"). On November 5 or 6, 1997, DFACS took custody of the children at Respondent Harrington's home.[5] Petitioner took a leave of absence from work and immediately came to the United States.

---

[4]The children were enrolled in private school in South Carolina, which is why they could not be located in any public or private school in Georgia.

[5]The Georgia court's November 15 order states that the children were picked up on November 6, 1997. However, the parties' briefs indicate that the children were picked up on November 5, 1997.

## II. PROCEDURAL HISTORY

A. *Superior Court Of Columbia County, Georgia*

On November 12, 1997, Petitioner filed a petition, pursuant to the Hague Convention and ICARA, in the Superior Court of Columbia County, Georgia (the "Georgia court"). Petitioner filed her petition in that forum because that Georgia court had issued the wiretap and seizure orders and because the children were in Columbia County, Georgia, in the custody of Georgia DFACS.

After a hearing, another judge of that same Georgia court entered an order, dated November 15, 1997, finding lack of jurisdiction in Georgia and transferring the case to South Carolina. Instead of dismissing the case, the Georgia court transferred the case to the neighboring court a few miles away in South Carolina, stating in its order that the parties "stipulated to a transfer of the proceedings verses [sic] dismissal and refiling in the event this Court found no authority for exercising jurisdiction in Georgia."

B. *Family Court Of Aiken County, South Carolina*

The Family Court of Aiken, South Carolina (the "South Carolina court") held a brief hearing on November 26, 1997, but determined that it could not hear the merits of the ICARA petition until January 16, 1998. In a later order (which Respondents state was entered on December 2, 1997, but which is dated December 11, 1997), the South Carolina court directed that the children be released temporarily from the custody of DFACS in Georgia and placed in the temporary custody of Respondent Harrington in Georgia and that the passports of the children, Respondent Lops, and Respondent Harrington be surrendered.

The Georgia court had transferred the case to South Carolina because the children and Respondent Lops had resided in South Carolina before Georgia DFACS picked up the children. However, the South Carolina court then ordered DFACS in Georgia to release the children to reside

in Georgia with Respondent Harrington, albeit temporarily, until the South Carolina court could hear the merits of the ICARA petition.

C. *Federal Court In Georgia*

On December 3, 1997, Petitioner filed an ICARA petition in the federal district court for the Southern District of Georgia located in Augusta, Georgia. On December 3, 1997, the district court issued an order directing that the custody of the children remain with Georgia DFACS pending further order of the court.

Expediting the case as ICARA and the Hague Convention require, the district court conducted two full days of evidentiary hearings on December 12 and 19, 1997. After closing arguments on December 22, 1997, the court orally entered detailed findings of fact and conclusions of law from the bench, plus a written final judgment finding that Respondents had wrongfully removed the children from Germany in violation of Petitioner's custody rights and ordering that the children should be returned to the custody of Petitioner for return to Germany. The children were released to Petitioner.

On December 23, 1997, this court granted Respondents' "motion for emergency stay" and enjoined all parties from removing the children from Georgia or South Carolina until further order of this court. From December 23, 1997 to the present, the children have resided with Petitioner in Georgia. This court also expedited the appeal.

III. EVIDENCE SUPPORTED DISTRICT COURT'S FINDINGS OF FACT

Respondents' first contention on appeal is that the district court's factual findings are clearly erroneous. We reject that contention because substantial evidence supports all of the district court's

factual findings.[6] In particular, the district court's pivotal factual finding that Respondents wrongfully removed the children from Germany in violation of Petitioner's custody rights is amply supported by the evidence in this record.

In light of the overwhelming evidence of wrongful removal in violation of Petitioner's custody rights, Respondents' appeal focuses more on the legal issues regarding whether the district court was precluded from hearing this ICARA petition due to either collateral estoppel or the abstention doctrine. Respondents also contend that even if they wrongfully removed the children, the district court erred in returning the children to Germany because Respondents proved the "well-settled" affirmative defense to an ICARA petition. We first discuss ICARA and the Hague Convention.

## IV. ICARA AND THE HAGUE CONVENTION

Congress enacted ICARA to implement the Hague Convention on the Civil Aspects of International Child Abduction,[7] a treaty to which the United States and Germany are signatories. 42 U.S.C. § 11601(b)(1). The goals of the Convention are "to secure the prompt return of children wrongfully removed to or retained in any Contracting State" and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States." The Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, art. 1, T.I.A.S. No. 11670, 19 I.L.M. 1501, 1501 [hereinafter "Hague Convention"].

---

[6]We review the district court's factual findings for clear error and its legal conclusions *de novo. Lykes Bros., Inc. v. United States Army Corps of Engineers,* 64 F.3d 630, 634 (11th Cir.1995).

[7]"The Convention on the Civil Aspects of International Child Abduction, done at The Hague on October 25, 1980, establishes legal rights and procedures for the prompt return of children who have been wrongfully removed or retained, as well as for securing the exercise of visitation rights." 42 U.S.C. § 11601(a)(4).

Article 3 of the Hague Convention provides that the removal or retention of a child is wrongful where it violates the custody rights of another person that were actually being exercised at the time of the removal or retention or would have been exercised but for the removal or retention, as follows:

> The removal or the retention of a child is to be considered wrongful where—
>
> a it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention, art. 3. The removal of a child from the country of his or her habitual residence[8] is "wrongful" under the Hague Convention if the petitioner "is, or otherwise would have been, exercising custody rights to the child under that country's law at the moment of removal." *Friedrich v. Friedrich,* 78 F.3d 1060, 1064 (6th Cir.1996) (citing Hague Convention, art. 3).

Under ICARA, a person may file a petition for the return of a child in any court authorized to exercise jurisdiction "in the place where the child is located at the time the petition is filed," as follows:

> Any person seeking to initiate judicial proceedings under the Convention for the return of a child ... may do so by ... filing a petition ... in any court which has jurisdiction of such action and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed.

---

[8]Respondents argue that the children were with Petitioner in Belgium from January 1995 to May 1995, that their "habitual residence" was Belgium, even though they returned to Germany in early May 1995, and that the Hague Convention and ICARA do not apply because Belgium is not a signatory to the Hague Convention. The federal district court correctly rejected Respondents' argument and did not err in finding that the children's habitual residence since birth had been Germany and still was in Germany at the time of the wrongful removal. Both the German family court and the German appellate court likewise rejected Respondent Lops's contention that the children's habitual residence was Belgium and that the German courts lacked jurisdiction.

42 U.S.C. § 11603(b).  ICARA further provides that a petitioner has the burden to show by a preponderance of the evidence that the petitioner was exercising custody rights at the time of the removal and that the removal was wrongful.  42 U.S.C. § 11603(e)(1)(A); *Friedrich,* 78 F.3d at 1064.  If a petitioner meets this burden, ICARA requires that "[c]hildren who are wrongfully removed or retained ... are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies."  42 U.S.C. § 11601(a)(4).

A court considering an ICARA petition has jurisdiction to decide the merits only of the wrongful removal claim, not of any underlying custody dispute.  *Friedrich,* 78 F.3d at 1063;  *see also Feder v. Evans-Feder,* 63 F.3d 217, 221 & n. 5 (3d Cir.1995);  *Rydder v. Rydder,* 49 F.3d 369, 372 (8th Cir.1995).  The Hague Convention is intended to "restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court."  *Friedrich,* 78 F.3d at 1064;  *see also Feder,* 63 F.3d at 221;  *Rydder,* 49 F.3d at 372.

Finally, Article 11 of the Hague Convention contemplates that courts shall expedite ICARA proceedings, stating:

> The judicial or administrative authorities of Contracting States shall act expeditiously in proceedings for the return of children.
>
> If the judicial or administrative authority concerned has not reached a decision within six weeks from the date of the commencement of the proceedings, the applicant or the Central Authority of the requested State, on its own initiative or if asked by the Central Authority of the requesting State, shall have the right to request a statement of the reasons for the delay.  If a reply is received by the Central Authority of a requested State, that Authority shall transmit the reply to the Central Authority of the requesting State, or to the applicant, as the case may be.

Hague Convention, art. 11.  Against this ICARA background, we turn to Respondents' collateral estoppel argument.

## V. COLLATERAL ESTOPPEL

A. *Georgia Court's Transfer Order Erroneously Imposed Residency Test On ICARA*

Respondents' collateral estoppel argument is based solely on the Georgia court's interlocutory order, entered November 15, 1997, transferring Petitioner's ICARA petition from a Georgia trial court to a South Carolina trial court. The federal district court in Georgia properly found that it had jurisdiction over the ICARA petition because the children, picked up at Respondent Harrington's home in Georgia, were in Georgia DFACS's custody at the time the petition was filed and thus were "located" under ICARA in the same place as the district court. The district court also correctly determined that Respondents had more than sufficient contacts with Georgia to satisfy due process requirements.[9] The federal district court concluded that neither res judicata nor collateral estoppel applied because federal district courts must determine their own jurisdiction.[10]

In contrast, the Georgia court's transfer order incorrectly applied a traditional residency test and erroneously concluded (a) that the children were not "located" in Georgia under ICARA, and

[9]Respondent Harrington resides in Martinez, Georgia. Regarding Respondent Lops, the district court found that "on the evidence that I have heard, contrary to the much abbreviated record that was developed before Judge Allgood, these children have a dual residence at least between Anne Harrington's residence in Columbia County and Michael Lops' house that he occupies, courtesy of his mother, in North Augusta." Respondent Lops and the children regularly went back and forth between Augusta and Martinez, Georgia, and North Augusta, South Carolina. To the extent he worked, Respondent Lops worked for House Rentals, which the district court also found had offices in Georgia, either in Richmond or Columbia County. The record before the district court was replete with other evidence that Respondents had more than sufficient contacts with Georgia to satisfy due process requirements.

[10]We review the district court's determination that res judicata and collateral estoppel do not apply *de novo. See Richardson v. Miller,* 101 F.3d 665, 667-68 (11th Cir.1996). The district court's conclusions of law state:

> In determining its own jurisdiction a federal district court is not bound by res judicata. Nor are the parties bound by any collateral estoppel with respect to the factual findings made by any other court. Indeed, it is the duty of a federal district court to determine a sufficiency of jurisdictional facts to properly decide or ascertain its own jurisdiction.

On appeal, the parties correctly focus on collateral estoppel since this case involves issue preclusion and not claim preclusion.

(b) that it lacked personal jurisdiction over Respondent Lops and the children.[11] "Located" under ICARA does not require a showing of residency but contemplates the place where the abducted children are discovered. 42 U.S.C. § 11603(b). Thus, the children were "located" in Georgia for purposes of ICARA. There was also ample evidence supporting the district court's finding that Respondents had more than sufficient contacts with Georgia to satisfy due process requirements.

Nonetheless, Respondents contend that under the doctrine of collateral estoppel, the Georgia court's prior determination, even if erroneous, that jurisdiction did not lie in Georgia barred the federal district court in Georgia from later finding it had jurisdiction over Respondents and the children in order to hear the ICARA petition. Respondents cite several cases for the proposition that when the issue of personal jurisdiction has been fully litigated and finally decided by a state court, that decision must be given full faith and credit in federal court. However, unlike the case before us, each decision cited by Respondents involves a final judgment entered by the state court.[12] Even

---

[11]The November 3, 1997 order directing the children to be picked up at Respondent Harrington's home and placed in the custody of Georgia DFACS was issued by Superior Court Judge Bernard J. Mulherin, Sr., of the Superior Court of Columbia County, Georgia. However, Judge Robert L. Allgood, of that same court, presided over the ICARA action Petitioner filed in the Superior Court of Columbia County, Georgia. In his November 15, 1997 order, Judge Allgood determined that despite "the actual physical seizure of the children in Georgia," there were insufficient contacts in Georgia for personal jurisdiction over the children and Respondent Lops, and thus Judge Allgood transferred the matter to the Family Court of Aiken County, South Carolina. The district court also correctly found that the children's dual residence with Respondent Harrington in Georgia yielded more than sufficient contacts with Georgia to satisfy due process requirements. *See supra* note 9.

[12]Each decision cited by Respondents and the dissent involved an actual final dismissal and/or a final judgment entered in the state court action. *See Underwriters Nat'l Assurance Co. v. North Carolina Life & Accident & Health Ins. Guar. Ass'n.,* 455 U.S. 691, 706, 102 S.Ct. 1357, 1366-67, 71 L.Ed.2d 558 (1982) (Indiana state court final order settling and dismissing all claims); *Durfee v. Duke,* 375 U.S. 106, 111, 84 S.Ct. 242, 244, 11 L.Ed.2d 186 (1963) (Nebraska state court final order in quiet title action with no appeal); *American Surety Co. v. Baldwin,* 287 U.S. 156, 166, 53 S.Ct. 98, 101, 77 L.Ed. 231 (1932) (Idaho state court final judgment on supersedeas bond affirmed on appeal); *Baldwin v. Iowa State Traveling Men's Ass'n,* 283 U.S. 522, 524-26, 51 S.Ct. 517, 517-18, 75 L.Ed. 1244 (1931) (Missouri state court final default judgment with no

assuming *arguendo* that Respondents are correct that a state court final judgment regarding personal

jurisdiction may bar a federal court's reconsidering that issue in certain circumstances, the doctrine

of collateral estoppel is inapplicable here because the Georgia court's interlocutory transfer order

was not a final judgment and was not an otherwise final appealable order under Georgia law.

B. *Collateral Estoppel Requires A Final Judgment Or A Final Appealable Order*

Under the Full Faith and Credit Act, federal courts generally should respect state court

judgments, even where erroneous. 28 U.S.C. § 1738; *Matsushita Elec. Indus. Co., Ltd. v. Epstein,*

516 U.S. 367, 373, 116 S.Ct. 873, 877, 134 L.Ed.2d 6 (1996). In deciding whether the Georgia

court's transfer order is entitled to preclusive effect, this court must determine first whether that

order was a "final judgment" under Georgia law. *See Gresham Park Community Org. v. Howell,*

652 F.2d 1227, 1242 (5th Cir. Unit B Aug.10, 1981); *First Nat'l Bank of Dublin v. Colonial Fire*

---

appeal); *Deckert v. Wachovia Student Fin. Servs.,* 963 F.2d 816, 819 (5th Cir.1992) (Texas state court final order dismissing case for lack of personal jurisdiction); *Harbuck v. Marsh Block & Co.,* 896 F.2d 1327, 1329 (11th Cir.1990) (New York state court final order granting permanent stay of arbitration with dismissed appeal); *Wiggins v. Pipkin,* 853 F.2d 841, 842 (11th Cir.1988) (Florida state court final order dismissing case for lack of personal jurisdiction); *American Steel Bldg. Co. v. Davidson & Richardson Constr. Co.,* 847 F.2d 1519, 1521 (11th Cir.1988) (Texas state court final default judgment); *Rubaii v. Lakewood Pipe of Texas,* 695 F.2d 541, 543 (11th Cir.1983) (Florida state court final order dismissing case for lack of personal jurisdiction); *see also United States v. Timmons,* 672 F.2d 1373, 1378 (11th Cir.1982) (federal court final judgment in condemnation action).

In contrast, this case does not involve a final judgment or dismissal but only an interlocutory transfer order. The dissent acknowledges that "[t]he wrinkle here is that the Georgia court did not simply dismiss the case." The dissent then dismisses this "wrinkle" as insignificant and advocates that the Georgia courts would still view this interlocutory transfer order as effectively a dismissal and consider the transfer order a final judgment. However, this ignores the fact that Georgia courts have not viewed or recharacterized transfer orders as dismissals but directly have held that transfer orders in civil cases are not final appealable orders because the case is still pending in the court below. *See Fulton County Dep't of Family and Children Servs. v. Perkins,* 244 Ga. 237, 259 S.E.2d 427 (1978); *Wright v. Millines,* 212 Ga.App. 453, 442 S.E.2d 304, 304 (1994); *Griffith v. Georgia Bd. of Dentistry,* 175 Ga.App. 533, 333 S.E.2d 647, 647 (1985).

*Underwriters' Ins. Co.,* 160 Ga. 166, 167, 127 S.E. 455 (1925). A final judgment is required before any possibility of application of the doctrine of res judicata or collateral estoppel may arise. *Quinn v. State,* 221 Ga.App. 399, 471 S.E.2d 337, 339 (1996), *aff'd,* 268 Ga. 70, 485 S.E.2d 483 (1997); *Green v. Transport Ins. Co.,* 169 Ga.App. 504, 313 S.E.2d 761, 763 (1984). No Georgia case has held that a transfer order represents a final judgment in the transferring court, much less given preclusive effect to a transfer order.

Nonetheless, we recognize that under Georgia law finality for preclusion purposes may also be measured by the same standard as finality for appealability purposes. *See Gresham Park Community Org. v. Howell,* 652 F.2d 1227, 1241-42 (5th Cir. Unit B Aug.10, 1981); *see also Culwell v. Lomas & Nettleton Co.,* 242 Ga. 242, 248 S.E.2d 641, 642 (1978); *Dep't of Corrections v. Robinson,* 216 Ga.App. 508, 455 S.E.2d 323, 324 (1995). Therefore, in order to determine whether the transfer order was final for preclusion purposes, we must also examine whether the transfer order could be considered a final appealable order. Close examination of Georgia law reveals that the Georgia court's transfer order was also not a final appealable order for several reasons.

C. *Transfer Order Was Not A Final Appealable Order Under Section 5-6-34(a)(1)*

First, a transfer order, especially one entered only ten days after a case begins, is an inherently interlocutory order and not appealable. Under Georgia law, the only way this interlocutory transfer order may be converted into a final appealable order is if it falls under this Georgia statute: O.C.G.A. § 5-6-34(a)(1), entitled in part "Judgments and rulings deemed directly appealable."

Section 5-6-34 provides that an order becomes directly appealable when the case is "no longer pending in the court below," as follows:

(a) Appeals may be taken to the Supreme Court and the Court of Appeals from the following judgments and rulings of the superior courts, the constitutional city courts, and such other courts or tribunals from which appeals are authorized by the Constitution and laws of this state:

(1) All final judgments, that is to say, *where the case is no longer pending in the court below,* except as provided in Code Section 5-6-35;....

O.C.G.A. § 5-6-34(a)(1) (emphasis supplied). The "in the court below" language in § 5-6-34(a)(1) is generally used to refer to a trial court as distinguished from an appellate court. A literal reading of § 5-6-34(a)(1) supports the conclusion that an order transferring a case from a trial court to a different trial court is not appealable, because that case is still "pending in the court below." This is especially true here, given the fact that the parties stipulated to a transfer to another trial court, as opposed to a dismissal of the case.

D. *Georgia Courts Follow General Rule That Transfer Orders In Civil Cases Are Not Final Judgments*

Second, Georgia courts repeatedly have held that transfer orders are not final appealable orders under § 5-6-34(a)(1) because a case transferred from one trial court to another trial court is still "pending in the court below." *See, e.g., Wright v. Millines,* 212 Ga.App. 453, 442 S.E.2d 304, 304 (1994); *Griffith v. Georgia Bd. of Dentistry,* 175 Ga.App. 533, 333 S.E.2d 647, 647 (1985).

For example, in *Griffith,* the action was transferred from a trial court in one jurisdiction to a trial court in a different jurisdiction. The Georgia appellate court dismissed the appeal, concluding that "[t]he subject transfer order is not a final judgment as the case is still pending in the court below, *albeit a different court from the one ordering the transfer."* 333 S.E.2d at 647 (emphasis supplied). The appellate court held that "[t]he order is thus interlocutory and not appealable...." *Id.* This same result prevailed in *Wright,* which held that the appeal of a transfer of a civil case from one trial court to a different trial court was "premature as there is no final judgment and the case *remains pending in the trial court,* albeit the Superior Court of Douglas County to which the case was transferred

rather than the Superior Court of Fulton County where plaintiff filed his notices of appeal." 442 S.E.2d at 304 (emphasis supplied).[13]

Finally, Georgia's general rule that transfer orders are not "final appealable orders" also adheres when an order transfers a case to a *different type* of trial "court below." *Fulton County Dep't of Family and Children Servs. v. Perkins,* 244 Ga. 237, 259 S.E.2d 427 (1978). *Perkins,* a child custody case closest in point, merits full review. After Georgia DFACS took custody of their child, the foster parents in *Perkins* filed a complaint in the superior court for authorization to adopt the child and for a writ of habeas corpus returning the child. The court dismissed all claims but the habeas petition and then transferred the case to the juvenile court, which earlier had asserted jurisdiction over matters relating to custody of the child. Following the transfer, the juvenile court vacated its earlier order asserting jurisdiction and transferred the case back to the superior court. DFACS appealed contending both transfer orders were "final" because "once a transfer order is entered, then the case is no longer pending in that court...." *Id.* at 428.

The Georgia appellate court held that neither transfer order was appealable.[14] The appellate court first acknowledged that an order transferring *a criminal case* from a juvenile court to a superior court may be a final appealable order because it concludes all matters in the juvenile court

---

[13]Both *Griffith* and *Wright* involved transfers from one court jurisdiction to a separate and distinct court jurisdiction. *Wright* involved a transfer from the Superior Court of Fulton County in the Atlanta Judicial Circuit in Judicial District 5 to the Superior Court of Douglas County in the Douglas Judicial Circuit in Judicial District 10. *Griffith* involved a transfer from the Superior Court of Bibb County in the Macon Judicial Circuit in Judicial District 3 to the Superior Court of Fulton County in the Atlanta Judicial Circuit in Judicial District 5.

[14]The issue in *Perkins* was whether the transfer orders appealed from were final orders within the meaning of then-existing Ga.Code Ann. §§ 24A-3801 and 6-701. 259 S.E.2d at 428. In 1981, these code sections were renumbered, respectively, as O.C.G.A. § 15-11-64 and O.C.G.A. § 5-6-34, the latter of which is at issue in this case. The court held that the transfer orders were "not final and hence ... not appealable without a certificate of immediate review." *Id.* at 429.

and changes the nature of the proceeding. *Id.* at 428-29.[15] The court explained *that a transfer order in divorce, alimony, or habeas corpus (custody) cases changes the forum but does not change the nature of the proceeding. Id.* at 429. The court concluded that despite the transfer of forum, "*[a] transfer of a child custody case is a continuation of that proceeding whereas a transfer of a juvenile for trial of a crime as an adult is not a continuation of the same proceeding.*" *Id.* (emphasis supplied). Even though the transferring court loses jurisdiction and the case is no longer pending in that court, Georgia courts repeatedly have held that an order transferring *a civil case* from one trial court to another trial court is not appealable because the case is still pending in a court below, albeit a different court below.

As in *Perkins, Griffith,* and *Wright,* the transfer of this civil case to another trial court, albeit a South Carolina trial court, is a continuation of the same civil proceeding originally initiated in the Georgia trial court. This case, if anything, presents an even stronger case for a finding of non-appealability under Georgia law because the parties stipulated to the transfer and a continuation of the proceedings, as opposed to a dismissal. The Georgia court's transfer order in this civil case changed only the forum and not the nature of the proceeding in the court below, and thus is not a final appealable order under Georgia law.[16]

---

[15]The court was referring to *J.T.M. v. State of Georgia,* 142 Ga.App. 635, 236 S.E.2d 764 (1977), which held that an order transferring a criminal case from a juvenile court to a superior court for final disposition is a final appealable order. *Id.* at 765; *see also Rivers v. State of Georgia,* 229 Ga.App. 12, 493 S.E.2d 2, 4 (1997).

[16]The dissent concludes that Petitioner was judicially estopped from contending that venue was proper and that personal jurisdiction was present in Georgia. To reach this conclusion, the dissent argues that Petitioner stipulated that venue was improper and that personal jurisdiction was wanting in Georgia. However, Petitioner never made any such stipulation about venue or personal jurisdiction. Instead, the Georgia court's order recites that the parties "stipulated to a transfer of the proceedings verses [sic] dismissal and refiling in the event this Court found no authority for exercising jurisdiction in Georgia." Petitioner consented to transfer in the event the Georgia court rejected her contentions and found no authority for exercising jurisdiction in

E. *Interstate Transfers In Georgia's Juvenile Court Cases*

We note that two Georgia decisions have allowed orders transferring juveniles, adjudicated as delinquent in Georgia, to another state to be appealable, but those cases involve "adjudicatory orders" on the merits of the case and are not applicable here. *In the Interest of T.L.C.,* 266 Ga. 407, 467 S.E.2d 885 (1996); *G.W. v. State of Georgia,* 233 Ga. 274, 210 S.E.2d 805 (1974).[17] In these two juvenile court cases, the Georgia appellate court allowed juveniles to appeal the "adjudicatory order" transferring their case to another state for disposition because that adjudicatory order also decided the merits of the case, determined whether the juveniles had committed the acts charged, and adjudicated them as delinquent. *See* O.C.G.A. §§ 15-11-33 and 15-11-35. However, these quasi-criminal juvenile cases do not cite or discuss O.C.G.A. § 5-6-34(a)(1), and never discuss whether the case is still pending "in the court below." Instead, these cases adopt an equal protection analysis because the juveniles had been adjudicated delinquent, and denying them an opportunity

---

Georgia. Petitioner's argument to the district court that venue was proper, and jurisdiction present, was not inconsistent at all with the same arguments Petitioner made to the Georgia court. Judicial estoppel does not apply. Even Respondents admit Petitioner stipulated for the case to be transferred to South Carolina and Respondents do not contend that Petitioner ever stipulated that venue was improper or personal jurisdiction in Georgia was lacking.

[17]The dissent also cites *Arnold v. Jordan,* 190 Ga.App. 8, 378 S.E.2d 139 (1989), involving an interstate transfer order, but the *Arnold* court "granted the father's application for discretionary review." 378 S.E.2d at 141. O.C.G.A. § 5-6-34(b) provides that the courts "may thereupon, *in their discretion,* permit an appeal to be taken" from certain interlocutory orders or non-final judgments. The dissent concludes that *Arnold* involves discretionary review of domestic relations cases under O.C.G.A. § 5-6-35(a)(2) and not discretionary review of an interlocutory order or non-final judgment under O.C.G.A. § 5-6-34(b). *Arnold* cites no statute or decision after its statement granting discretionary review. Thus, *Arnold* 's reference to "discretionary review" could be read to cover both types of discretionary review. Even if the "discretionary review" in *Arnold* was under only § 5-6-35(a)(2), the parties in *Arnold* did not consent to a transfer as opposed to a dismissal as the parties did here, which is an important factual distinction. Also, Georgia courts have held that intrastate transfer orders in certain cases are directly appealable which undermines the dissent's proposed interstate versus intrastate bright-line distinction. *Rivers v. State of Georgia,* 493 S.E.2d 2, 4 (1997); *J.T.M. v. State of Georgia,* 142 Ga.App. 635, 236 S.E.2d 764, 765 (1977).

to appeal a finding of guilt denies the juveniles equal protection of the laws. *Id.* at 806.

In any event, the facts in this case are materially different from those in *G.W.* and *T.L.C.* Here, the parties stipulated to the transfer of the case to South Carolina, *thus waiving any right to appeal* in Georgia and, *a fortiori, waiving any equal protection argument.* The parties' stipulation alone makes these juvenile court cases inapplicable. In addition, there was no determination on the merits of Petitioner's substantive claims, but only a preliminary determination that the Georgia state court was not the proper forum to hear the merits of the case. At a minimum, these juvenile court cases in *G.W.* and *T.L.C.* are not persuasive authority for the interpretation a federal court should give to § 5-6-34(a)(1) because they do not cite or discuss this statute. Instead, the civil cases discussed earlier are more closely in point.[18]

F. *Parties' Stipulation to Transfer*

Finally, the parties' unique stipulation to the transfer here makes this transfer order particularly non-appealable under Georgia law. This case remained, by stipulation, in the court

---

[18]After acknowledging that intrastate transfers from one trial court to a different trial court are not final appealable orders because Georgia courts hold the case is still pending in the court below, the dissent broadly asserts that interstate transfer orders are treated entirely differently by the Georgia courts. However, the Georgia courts have not created a different rule for transfer orders intrastate versus interstate. For example, in *G.W.,* the Georgia Supreme Court could have, but did not, create a bright-line rule distinguishing between intrastate transfers and interstate transfers. If the Georgia Supreme Court had wanted to make a new or different rule for all interstate transfers, the court could have noted that, because the case was transferred out of state, it was "no longer pending in any court below." However, the *G.W.* opinion *does not cite or discuss § 5-6-34(a)(1) and does not address whether the case was "no longer pending in the court below."* Instead, the court employed an equal protection analysis to allow a non-resident juvenile *adjudicated* delinquent to appeal that adjudication.

Similarly, the Georgia Supreme Court, in *T.L.C.,* did not cite or discuss § 5-6-34(a)(1), or whether the case still was pending in the court below. Rather, the Georgia Supreme Court merely cited *G.W.* in reaching the same conclusion as *G.W.* when facing facts materially indistinguishable from *G.W.* The *T.L.C.* court did not expand *G.W.,* but rather quoted only from the last sentence of *G.W.* in support of its conclusion that the litigant in *T.L.C.* had a right to appeal immediately the adjudicatory order in that case.

below, albeit a different court below. We see no reason a Georgia court would be inclined to hold that parties may convert this inherently interlocutory transfer order under § 5-6-34(a)(1) to a final appealable order when they stipulated to the transfer as opposed to a dismissal.[19]

We conclude that Georgia courts would not consider this transfer order in this type of case a final appealable order under § 5-6-34(a)(1) because the case was transferred from one trial court to another trial court and remained pending "in the court below." Section 5-6-34(a)(1) does not state "no longer pending in the same court" or "no longer pending in a court in Georgia" or "no longer pending in the court that issued the order on appeal," but states only "no longer pending in the court below." We should not add qualifying or limiting terms to an otherwise clear state statute. This is also *not* the construction the Georgia courts have placed on this statute when considering transfer orders in civil cases. We find that the Georgia courts would hold that this type of transfer order, entered only ten days after this civil case was filed, was not a final appealable order under § 5-6-

---

[19]The dissent contends that the Georgia trial court lacked authority to transfer the case to South Carolina, and thus the dissent recharacterizes the transfer order as a dismissal. Since a transfer order is interlocutory and not appealable under Georgia law, the dissent recharacterizes the transfer order as a dismissal in order to make it a final judgment and appealable. There is no statutory or decisional authority for the dissent's proposition that this transfer order should be treated somehow as an effective dismissal.

Further, the parties' consent to the transfer not only provides the authorization but also waives any right to complain about any error in transferring the case to South Carolina. Respondents wanted the case to go to the South Carolina court, which in turn accepted jurisdiction. Whether the South Carolina court was required to take jurisdiction is not a question we have to face or resolve.

Alternatively, the dissent argues that since the Georgia court lacked authority to transfer the case, the transfer order was "a nullity." We are aware of no authority which permits, much less compels, us to conclude that a "null" transfer can be considered a "final judgment" for purposes of collateral estoppel. To the contrary, something that is null has no legal or binding force. *See* BLACK'S LAW DICTIONARY 1067 (6th Ed.1990) (defining "nullity" as "an act or proceeding in a cause which the opposite party may treat as though it had not taken place, or which has absolutely no legal force or effect.").

34(a)(1) because the transfer changed only the forum and not the nature of the proceeding and because the parties stipulated to the transfer, as opposed to a dismissal.[20]

## VI. ABSTENTION

We next address Respondents' argument that the exercise of wise judicial administration required the district court, as a matter of law, to abstain due to the parallel South Carolina action. *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Co.,* 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). We hold that the district court did not abuse its discretion in declining to abstain for several reasons.[21]

First, "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule." *Colorado River,* 424 U.S. at 813, 96 S.Ct. at 1246. When a parallel state court action exists, the Supreme Court has emphasized that "[t]he doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow

---

[20]Georgia courts also recognize that the application of collateral estoppel may be avoided where it would result in "manifest injustice" to a party. *See Fierer v. Ashe,* 147 Ga.App. 446, 249 S.E.2d 270, 273 (1978). Thus, alternatively, Georgia courts, at a minimum, would find that manifest injustice results if preclusive effect is given to this transfer order where the parties stipulated to the transfer and where the Georgia court erroneously interpreted federal law.

[21]We review the district court's decision whether to abstain for abuse of discretion. *See Rindley v. Gallagher,* 929 F.2d 1552, 1554 (11th Cir.1991).

The dissent correctly notes that the *Colorado River* doctrine is not a traditional form of abstention, *see Colorado River,* 424 U.S. at 817, 96 S.Ct. at 1246, but is based on "considerations of "wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.' " *Id.* (quoting *Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.,* 342 U.S. 180, 183, 72 S.Ct. 219, 221, 96 L.Ed. 200 (1952)). However, since prior decisions of this court label a federal court's deference to a parallel state court litigation as a type of abstention, we do likewise. *See, e.g., Lake Lucerne Civic Ass'n v. Dolphin Stadium Corp.,* 878 F.2d 1360, 1373 (11th Cir.1989); *Forehand v. First Alabama Bank of Dothan,* 727 F.2d 1033, 1035 (11th Cir.1984); *Fountain v. Metropolitan Atlanta Rapid Transit Auth.,* 678 F.2d 1038, 1046 (11th Cir.1982).

exception to the duty of a District Court to adjudicate a controversy properly before it." *Id.* (quoting

*County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 188-89, 79 S.Ct. 1060, 1063, 3 L.Ed.2d

1163 (1959)). "[T]he pendency of an action in the state court is no bar to proceedings concerning

the same matter in the Federal court having jurisdiction...." *Id.* at 817, 96 S.Ct. at 1246 (quoting

*McClelland v. Carland,* 217 U.S. 268, 282, 30 S.Ct. 501, 505, 54 L.Ed. 762 (1910)). Instead, the

Supreme Court has emphasized "the *virtually unflagging obligation* of the federal courts to exercise

the jurisdiction given them." *Id.* at 817, 96 S.Ct. at 1246 (emphasis supplied).

Second, all relevant factors support the district court's decision to hear the ICARA petition

and not abstain. When a parallel state court action pends, the Supreme Court has outlined six factors

for federal courts to consider in determining whether to abstain and dismiss a federal action: (1)

whether one of the courts has assumed jurisdiction over any property in issue; (2) the inconvenience

of the federal forum; (3) the potential for piecemeal litigation; (4) the order in which the forums

obtained jurisdiction; (5) whether federal or state law will be applied; and (6) the adequacy of each

forum to protect the parties' rights. *Moses H. Cone,* 460 U.S. at 15-16, 23-27, 103 S.Ct. at 936-37,

941-43; *Colorado River,* 424 U.S. at 818, 96 S.Ct. at 1246-47. No one factor is per se

determinative. *Moses H. Cone,* 460 U.S. at 16, 103 S.Ct. at 937. How each factor is weighed

depends on the facts of each case. *Id.*

Here, neither the state nor the federal court had jurisdiction over any property in issue,

rendering the first factor inapplicable. The remaining factors all counsel against abstention. The

federal forum in Georgia was particularly convenient because the children were in the custody of

Georgia DFACS and Respondent Harrington lives in Georgia. Even Respondent Lops's residence

in North Augusta, South Carolina was on the Georgia and South Carolina border and only a few

miles from the federal district court in Augusta, Georgia. Although both state and federal courts

adequately could protect the parties' rights, ICARA is a federal statute enacted to implement a treaty

entered into by the federal government. Federal law provides the rule of decision in this case, which

counsels against abstention by the federal district court.[22] Additionally, there was no threat of

piecemeal litigation because the district court could, and did, resolve all issues.

Respondents contend that the South Carolina court's having jurisdiction first strongly favored

---

[22]The district court found this factor, as well as others, favored its declining to abstain:

> I have had some concerns ... relating to the parallel state proceedings that were originated in Georgia and subsequently transferred to the Family Court of South Carolina. I do not know of any concept that would bar the prosecution of both of these cases at the same time.
>
> ....
>
> Interestingly, because of the apparent heavy schedule of the Family Court of South Carolina, a hearing date could not be established until January 15, 1998. Because of the less demanding schedule apparently, this Court has been able to act and seeks to conclude the matter this 22nd day of December.
>
> ....
>
> I will be the first, in most instances, to give great deference to a pending proceeding in state court. However, the mere pendency of a parallel proceeding does not require the dismissal of a federal suit. This case, in my view, does not require dismissal of the federal action. Indeed, in my view, it is more appropriate for the federal court to proceed to disposition. After all, the act and the treaty, which the Petitioner seeks to enforce, are creatures of the federal sovereign as opposed to any state's sovereignty.
>
> The apparent election of the forum by the Petitioner can be and has been easily explained because the Georgia Court's [sic] were already involved through the efforts of the Georgia Bureau of Investigation to locate the children. And, indeed, Judge Mulherin of the Augusta Judicial Circuit, including Columbia County, had entered the order by which the trap and trace order was permitted with respect to the telephone calls.
>
> These observations, coupled with the fact that the case primarily involved the interpretation and application of federal law, impel me to continue in this matter to a dispositive level in this ICARA petition action.

abstention here. However, the Supreme Court has explained that the factor of which court first obtained jurisdiction involves more than a chronological assessment of whether the state or federal action was filed first. Rather, the question is whether proceedings are further along in one jurisdiction than in the other. *Moses H. Cone,* 460 U.S. at 21-22, 103 S.Ct. at 939-40; *Noonan South, Inc. v. County of Volusia,* 841 F.2d 380, 382 (11th Cir.1988). At the time the district court decided the case, the South Carolina case had just begun. More importantly, ICARA requires expedited judicial proceedings. The ICARA petition was transferred to the South Carolina court on November 15, 1997, but that court indicated on November 26 that it was not able to schedule a hearing on the merits of the wrongful removal until January 16, 1998.

The district court, on the other hand, was prepared to, and did, expedite the ICARA petition as required by ICARA. The ICARA petition was filed in the district court on December 3. The district court conducted two full days of evidentiary hearings on December 12 and 19 and heard closing arguments on December 22, after which the district court immediately dictated comprehensive findings of fact and conclusions of law, covering sixty-four pages of transcript in the record, and entered final judgment. This is what ICARA contemplates.

Respondents also argue that Petitioner, unhappy with the South Carolina court's releasing the children from Georgia DFACS to Respondent Harrington in Georgia, forum shopped and essentially "removed" her ICARA petition to federal court. Respondents ignore that they were the original forum shoppers. Respondents first tried to forum shop this case away from the German courts, where Petitioner initiated custody proceedings. A German family court had jurisdiction first. Respondent Lops left Germany and wrongfully removed the children from Germany to try to avoid the German court's order and jurisdiction over him and the children. After Respondent Lops lost on the merits and on the jurisdiction issues before both the German family court and German

appellate court, Respondent Lops forum shopped and filed a divorce action in South Carolina in 1996.

While Petitioner normally should select one forum and stay there, the record established that Petitioner's filing in federal court in Georgia was motivated in large part by the South Carolina court's inability to hear her ICARA petition in an expedited manner as prescribed by ICARA and the Hague Convention. The dissent advocates that Petitioner's sole motivation for filing in federal court was because she was "apparently dissatisfied by a temporary custody decision of the South Carolina court" and that the district court failed to consider the "reactive nature of Mrs. Lops's suit." However, the record shows that the district court specifically considered the parallel state court proceedings but determined that the concurrent actions were in part caused by "the apparent heavy schedule" of the South Carolina court and Petitioner's inability to obtain a hearing until January 16 in the South Carolina court—over two months after her ICARA petition was transferred to South Carolina. The district court also recognized that Article 11 of the Hague Convention contemplates an immediate emergency hearing in international child abduction cases and a judicial decision within six weeks. Unlike the South Carolina state court, the district court was able to expedite the matter under the federal ICARA statute and thus the district court exercised its discretion to hear the case.

On appeal, the issue is not what we would have done but whether the district court abused its discretion in making its decision not to abstain. The district court fully considered the fact that a parallel South Carolina action existed, but exercised its discretion not to defer because the state court action had just begun, the South Carolina court, due to an "apparent heavy schedule," was not able to expedite the case when the federal court could, the construction of a federal statute was involved, and the federal forum was convenient to all parties. The district court acted because the federal law in issue contemplates an expedited hearing but the South Carolina court was failing to

act expeditiously.[23]

At a minimum, the parties were equal forum shoppers, which neutralizes this factor in the abstention equation.[24] Application of these *Colorado River* and *Moses H. Cone* factors readily reveals why the district court did not abuse its discretion in hearing the case, in declining to abstain,

[23]The different approaches by the dissent versus the district court to the abstention, or "wise judicial administration," issue appear to stem in part from the district court's view that Georgia law enforcement officials were heavily involved and the ICARA petition alleging international child abduction required expedited review but the South Carolina court could not hear the case due to its "apparent heavy schedule." In contrast, the dissent finds "[n]o such extenuating circumstances existed here, however." Nonetheless, the dissent acknowledges that "[t]his case involves legal claims of significant human importance," which is exactly why the district court expedited the case when the South Carolina court failed to schedule a hearing expeditiously in this international child abduction case.

The dissent also emphasizes that Petitioner continued to file pleadings in the South Carolina court action; however, after the district court ruled, Petitioner filed a motion to dismiss the South Carolina action and the Supreme Court of South Carolina ultimately stayed the South Carolina action. The record also reflects that since her children were in Georgia DFACS custody, Petitioner obtained a leave of absence from work in Germany and immediately flew to the United States to regain the custody of her children awarded by the German courts and that once in Georgia Petitioner's main goal was to obtain an expedited hearing on the merits of her international child abduction petition under ICARA as opposed to selecting a particular court or forum for that hearing. The district court recognized this, rejected Respondents' claims of forum shopping, and expedited the case as ICARA and the Hague Convention require. The dissent's harsh indictment of Petitioner for "egregious manipulation of ICARA's system of concurrent jurisdiction" is not supported by the district court's findings of fact and does not take into account the fact that the district court acted because it found that the South Carolina court was failing to act expeditiously because of its "apparent heavy schedule." *See supra* note 22.

[24]Respondents decry Petitioner's forum shopping but ignore not only their own forum shopping but also the misrepresentations made to accomplish their forum shopping. The district court found that Respondent Lops made misrepresentations to the German court and other officials by stating he would return the children to Petitioner after a few hours on May 10, 1995, and by not advising the German family court judge in the July 3, 1995 hearing that his mother already had wrongfully removed the children to the United States on June 27, 1995, and that he was already packing up his furniture and planning to leave on July 8, 1995, and by advising consulate officials on May 30, 1995 that Petitioner had abandoned the children in order to obtain new passports and wrongfully remove the children from Germany. The district court noted that a collateral effect of its decision is to give full faith and credit to the court orders in Germany.

and in expediting the case to final judgment.

## VII. RESPONDENTS' AFFIRMATIVE DEFENSE BASED ON ICARA'S WELL-SETTLED EXCEPTION

Once Petitioner satisfied her burden to show that a wrongful removal from Germany had occurred, the children must be returned to Germany unless Respondents established that any of the Hague Convention's affirmative defenses apply. 42 U.S.C. § 11603(e)(2); *Friedrich,* 78 F.3d at 1067. Respondents contend that the children should not be returned to Germany because they showed that the ICARA petition was filed more than one year after the wrongful removal of the children *and* that the children are now "well-settled" in their new environment. *See* Hague Convention, art. 12;[25] *see also Friedrich,* 78 F.3d at 1067. After reviewing the evidence at trial, we conclude that the district court correctly determined that Respondents had not established an affirmative defense under the "well-settled" exception or any other affirmative defense available under ICARA and that the district court did not err in ordering that the children be returned to Germany with Petitioner.[26]

---

[25]Article 12 states:

> Where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith. The judicial or administrative authority, even where the proceedings have been commenced after the expiration of the period of one year referred to in the preceding paragraph, shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment.

Hague Convention, art. 12. Respondents must establish this exception by a preponderance of the evidence. 42 U.S.C. § 11603(e)(2)(B).

[26]Respondents also contend that they established other affirmative defenses under ICARA by showing that Petitioner had consented, or at least acquiesced by her conduct, to the children's removal and that there was a significant risk of psychological harm if the children were returned

Although the petition was not filed within one year of the wrongful removal, the district court first determined that this one-year time limit, which in some respects is similar to a statute of limitations, may be equitably tolled. In doing so, the district court found that it is difficult to "conceive of a time period arising by a federal statute that is so woodenly applied that it is not subject to some tolling, interruption, or suspension, if it is shown or demonstrated clearly enough that the action of an alleged wrongdoer concealed the existence of the very act which initiates the running of the important time period." We are not required to reach the issue of whether equitable tolling may apply under ICARA because the evidence supported the district court's factual finding that the children were not yet "well-settled" under the Hague Convention.

The district court found that "well-settled" means more than having a comfortable material existence. In determining whether the children were "well-settled," the district court properly considered many relevant factors, including but not limited to several peculiar circumstances surrounding the children's living environment, Respondent Harrington's being more involved with the children in certain areas than Respondent Lops,[27] the active measures Respondents were

_____

to Germany after two and one-half years in the United States. Respondents have not shown that the district court erred in finding Respondents had not established these defenses. In particular, the evidence amply supported the district court's express factual findings that Petitioner had valid custody rights to the children, that Petitioner had persistently prosecuted and protected her custody rights in the German courts, and that Petitioner never consented or acquiesced to the removal but made concerted efforts to locate the children through international, national, and local agencies. Also, in finding that Respondents had not established any ICARA defenses, the district court succinctly noted that "the very idea of these children being placed in a position or status of pawns in the parents' skirmishes is, I will have to say, repugnant or deplorable. And this proceeding today and its conclusion is only the natural sequel of the initial decision made in May or June of 1995 to bring the children to the United States without the recognition of the mother's rights as accorded by German law and our treaty."

[27]The evidence indicated that although Respondent Lops worked only a few hours each week, Respondent Harrington picked the children up from school each day and attended more to the nurture and needs of the children. The district court found that Respondent Harrington was "in virtual control of the financial and other affairs of this family. I see that the grandmother

undertaking to keep Respondent Lops's and the children's whereabouts concealed from Petitioner and the German (and other) authorities, and the fact that Respondent Lops could be prosecuted for his violations of state and federal law because he was committing "four and five misdemeanors ... to conceal, at least himself, from any authority."  Other evidence adequately supported the district court's finding that the children were not "well-settled" as contemplated under ICARA and Article 12 of the Hague Convention.  Therefore, we conclude that the district court also did not err in its finding that Respondents had not established that the children were "well-settled."[28]

## VIII. CONCLUSION

We conclude that the district court correctly ordered that the two minor children, Claire Lops and Carmen Lops, be returned to the custody of Petitioner for immediate return to Germany.  In accordance with the terms of ICARA and the Convention, the district court's judgment also correctly resolves only Petitioner's wrongful removal claim and remands any matter regarding the underlying custody dispute to be resolved by German courts where the litigation between the parties first began and should be resolved.[29]  Thus, we affirm the judgment of the district court.

---

[Respondent Harrington] is a co-partner, co-participant in the abduction and in the maintenance of these appearances whose only object could be to conceal the existence of the origins of the children."

[28]Respondents also contend (1) that the district court erred in failing to consider the 1996 order in the divorce case Respondent Lops brought in a South Carolina court which awarded custody of the children to Respondent Lops;  (2) that the district court did not give Respondents a full and fair hearing;  (3) that the district court violated Respondent Lops's procedural and substantive due process rights;  and (4) that the district court erred in awarding Petitioner costs, fees, and expenses allowed by 42 U.S.C. § 11607(b)(3).  After review, we conclude that each contention lacks merit.

[29]The dissent acknowledges "the apparent soundness of the district court's ruling on the merits of the ICARA petition" and does not quarrel with our conclusions that the evidence and law supported the district court's findings that Respondents wrongfully removed the children from Germany to the United States in violation of Petitioner's custody rights, that Respondents failed to show that the children were "well-settled" in the United States, and that the children should be

AFFIRMED.

KRAVITCH, Senior Circuit Judge, dissenting:

This case involves legal claims of significant human importance. In her petition brought under the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601-11610, Mrs. Lops alleges that Mr. Lops wrongfully abducted their daughters, and she requests that the two girls be returned to her custody.

This court, however, must determine whether the district court was the proper court to hear the merits of the case. ICARA vests concurrent jurisdiction in state and federal courts. *See* 42 U.S.C. § 11603(a). Initially, Mrs. Lops chose to file her ICARA petition in the Superior Court of Columbia County, Georgia ("the Georgia court"), rather than in a federal district court. The Georgia court ruled that venue and personal jurisdiction did not lie in Georgia and, pursuant to the parties' stipulation, directed that the case be transferred to the Family Court of Aiken County, South Carolina ("the South Carolina court"), which assumed jurisdiction over the case. Then, apparently dissatisfied by a temporary custody decision of the South Carolina court and while that action was still pending, Mrs. Lops filed an identical ICARA petition with the United States District Court for the Southern District of Georgia ("the district court"), which, after ruling that venue and personal jurisdiction *did* exist in Georgia, proceeded to determine the merits of Mrs. Lops's ICARA petition. Because I conclude that the district court should not have exercised jurisdiction over the case, I respectfully dissent.

---

returned to Germany. The dissent also agrees "that the Georgia court misinterpreted the ICARA statute" and does not contest our conclusion that the Georgia court's transfer order erroneously held that jurisdiction did not lie in Georgia over Respondents and the children. Instead, the dissent advocates only that the federal district court should have dismissed the case based on collateral estoppel or under the abstention doctrine based on "wise judicial administration." Therefore, these two issues have been discussed in more detail in this decision.

In my view, the district court was required to accept the Georgia court's determinations that venue and personal jurisdiction determinations were lacking in Georgia. I believe that the majority, in holding to the contrary, misinterprets Georgia collateral estoppel law and undermines the Full Faith and Credit Act, 28 U.S.C. § 1738. *See infra* Part II.

Moreover, even if the district court was not precluded from hearing the case, the district court abused its discretion by failing to stay the case in deference to the South Carolina court. Such deference was required in light of the reactive nature of Mrs. Lops's federal suit and Mrs. Lops's circumvention of federal removal policy. Accordingly, even if preclusion principles do not apply, this court, in the interests of "wise judicial administration," *Colo. River Water Conservation Dist. v. United States,* 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976) (quotation omitted), should vacate the district court's judgment and order that it stay Mrs. Lops's federal action, *see infra* Part III.

## I.

Because I believe that the majority has omitted a few relevant details, I include a brief summary of the facts pertinent to my dissent. In 1995, Mr. Lops took his two daughters from Germany, where they were living with Mrs. Lops, to live with him in South Carolina. On November 6, 1997, Georgia law enforcement officials, acting pursuant to court order, seized the children, who were temporarily at the home of Mr. Lops's mother in Columbia County, Georgia, and placed the children in the custody of the Georgia Department of Family and Children Services.

On November 12, Mrs. Lops filed an ICARA petition in the Georgia state court seeking the return of her two children to Germany. On November 14, the Georgia court issued an order: (1) holding that venue and personal jurisdiction were lacking in Georgia and that the case should have

been brought in South Carolina, the jurisdiction where the children reside;[1] and (2) transferring the case to the South Carolina court pursuant to the parties' stipulation.[2]

On November 26, the South Carolina court held an initial hearing, during which it informed the parties that it would hear the merits of the ICARA petition on January 16, 1998.[3] On December 2, 1997, the South Carolina court informed the parties that during the pendency of the ICARA proceedings the children would be placed with Mr. Lops's mother, Anne E. Harrington, subject to an adequate security bond.[4] In a subsequent written order, the South Carolina court confirmed the

---

[1]The Georgia court stated that 42 U.S.C. § 11603(b) (stating that ICARA petition should be filed "in any court which has jurisdiction of such action and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed") reflected Congress's intent that ICARA petitions "be filed in the state where the child or children have primarily resided, not necessarily where they are found." Georgia court's Order of November 14, 1997, at 5. The children's permanent residence was in South Carolina, even though they were physically located in Georgia when Mrs. Lops filed suit. Thus, the court held that under ICARA Mrs. Lops should have filed suit in a South Carolina court. *Id.* at 5-7. This holding appears to constitute a ruling that venue did not lie in Georgia.

The Georgia court also determined that it could not exercise personal jurisdiction over Mr. Lops or the children:

But for the actual physical seizure of the children in Georgia, there has been no other minimally sufficient contact between the State of Georgia and the children or Mr. Lops which would rise to a sufficient level to meet [the] due process requirement for this Court to exercise jurisdiction in this matter.

*Id.* at 6.

[2]The court stated, "All parties stipulated to a transfer of the proceedings verses [sic] dismissal and refiling in the event this Court found no authority for exercising jurisdiction in Georgia." Georgia court's Order of November 14, 1997, at 7 n.2. The South Carolina court's first written order states that Mrs. Lops's ICARA petition was then filed in the South Carolina court. *See* South Carolina court's Order of December 11, 1997, at 1-2.

[3]*See* R3: 6, 36-37; Appellants' Reply Br. at 3.

[4]*See* Michael Lops's and Anne E. Harrington's Motion to Dismiss Order, December 10, 1997, at 2, 7; Appellants' Br. at 3; Appellants' Reply Br. at 8; *see also* Invoice of John L. Creson attached to Christine Lops's Motion for Attorney Fees and Costs, January 22, 1998, at 5 ("12/2/97 ... Telephone conference with Judge Nuessle's office."). Mrs. Lops does not contest

January 16 hearing date and the award of temporary custody to Mr. Lops's mother.[5]

On December 3, 1997, Mrs. Lops filed in the South Carolina court a motion to reconsider its December 2 decision regarding temporary custody.[6] Also on December 3, Mrs. Lops filed an ICARA petition in the federal district court. She did not move to dismiss the South Carolina court action at this time.[7]

Mr. Lops then moved to dismiss Mrs. Lops's federal suit on the grounds, *inter alia,* that: (1) the Georgia state court's jurisdictional ruling had preclusive effect in federal court in Georgia;[8] and (2) Mrs. Lops's suit represented an improper attempt by a state court plaintiff to obtain removal to federal court.[9] On December 22, the district court, in an oral order, denied Mr. Lops's motion to dismiss. The district court explicitly rejected the Georgia court's analysis of the ICARA statute,[10] and it also stated:

---

this fact.

[5]*See* South Carolina court's Order of December 11, 1997, at 2-4. The court also provided that "[i]f the Court finds that there has been a wrongful removal or detention then a further hearing has been scheduled for January 31, [1998,] determine [sic] whether any defense to return of the children to the Petitioner under the Hague [sic] or applicable State or Federal [sic] may be applicable." *Id.* at 3. This additional hearing actually was held on February 3, 1998.

[6]*See* Appellants' Br. at 3; Appellants' Reply Br. at 8. Mrs. Lops does not contest this fact.

[7]Mrs. Lops did not attempt to dismiss her South Carolina state court action until "within 48 hours of the January 16, 1998," hearing held by the South Carolina court. *See* South Carolina court's Order of January 27, 1998, at 2.

[8]*See* Michael Lops's Motion to Dismiss, December 19, 1997, at 1, ¶ 3; *see also* Michael Lops's and Anne E. Harrington's Motion to Dismiss Order, December 10, 1997, at 3-4, ¶ 9-10.

[9]*See* Michael Lops's and Anne E. Harrington's Motion to Dismiss Order, December 10, 1997, at 3-4, WW 10, 12.

[10]*See* District court's Order of December 22, 1997, at 7-8 (concluding that an ICARA petition should be filed in the jurisdiction where the children are "located," *see* 42 U.S.C. § 11603(b), rather than where they reside).

In determining its own jurisdiction a federal district court is not bound by res judicata. Nor are the parties bound by any collateral estoppel with respect to the factual findings made by any other court. Indeed, it is the duty of a federal district court to determine a sufficiency of jurisdictional facts to properly decide or ascertain its own jurisdiction.

\* \* \* \*

I have had some concerns ... relating to the parallel state proceedings that were originated in Georgia and subsequently transferred to the Family Court of South Carolina. I do not know of any concept that would bar the prosecution of both of those cases at the same time.

\* \* \* \*

This case, in my view, does not require dismissal of the federal action. Indeed, in my view, it is more appropriate for the federal court to proceed to disposition. After all, the act and the treaty, which the Petitioner seeks to enforce, are creatures of the federal sovereign as opposed to any state's sovereignty.

\* \* \* \*

Accordingly, it is my finding and conclusion ... that this federal district court is possessed of jurisdiction to decide the matter in its entirety....

District court's Order of December 22, 1997, at 7-11.

On January 16, 1998, the South Carolina court held the scheduled hearing on the merits of Mrs. Lops's ICARA petition. In a subsequent order pendente lite, the South Carolina court noted that Mrs. Lops had made an untimely attempt to file a motion to dismiss in the South Carolina court. *See* South Carolina court's Order of January 27, 1998, at 2 (denying Mrs. Lops's motion to dismiss because it was filed "within 48 hours" of the South Carolina court's substantive ICARA hearing on January 16, 1997, in plain violation of the court's "requisite 5 day notice requirement"). On January 17, Mrs. Lops filed a motion in district court requesting that the district court stay the South Carolina court proceedings. On February 3, the South Carolina court held an additional hearing on the merits of Mrs. Lops's ICARA petition. On February 13, the district court granted Mrs. Lops's motion to stay the South Carolina court proceedings, and shortly thereafter the Supreme Court of South Carolina stayed the South Carolina court proceedings pending resolution of the federal action.

II.

If the Georgia court simply had dismissed Mrs. Lops's ICARA petition for lack of venue and personal jurisdiction, then the federal district court in Georgia would have been precluded from assuming jurisdiction over Mrs. Lops's subsequent ICARA petition. *See infra* Part II.A. The Georgia court, however, after ruling that venue and personal jurisdiction were lacking in Georgia, did not dismiss the case but rather purported to transfer it to South Carolina. In my view, the fact that the Georgia court's order contained an interstate transfer directive does not alter the preclusive effect of the Georgia court's venue and personal jurisdiction rulings. First, the Georgia court was not authorized to transfer the case to another state, and thus its order must be considered a simple dismissal, plainly a final judgment under Georgia law. *See infra* Part II.B. Second, *even assuming that the Georgia court had the authority to order an interstate transfer,* I believe that the rationale of Georgia collateral estoppel doctrine, *see infra* Part II.C, and the plain language of Georgia statutory provisions and case-law, *see infra* Part II.D and Part II.E, compel the conclusion that the Georgia court's order was a final judgment entitled to preclusive effect.[11]

Although no case squarely addresses the issues in this case, I believe that all relevant legal authority demands the same conclusion: The Georgia court's order was a final judgment entitled to preclusive effect under Georgia law. Because the majority fails to apply collateral estoppel to the Georgia court's decision, I consider the majority's holding a troubling precedent for federal courts' compliance with the Full Faith and Credit Act, 28 U.S.C. § 1738.

A.

The preclusive effect of a Georgia court's judgment is governed by Georgia preclusion law.

---

[11]I also believe that no exception to Georgia's collateral estoppel doctrine is applicable here. *See infra* Part II.F.

As the Supreme Court has explained, the Full Faith and Credit Act, 28 U.S.C. § 1738, "mandate[s] that the "judicial proceedings' of any State "shall have the same full faith and credit in every court within the United States ... as they have by law or usage in the courts of such State ... from which they are taken.' " *Matsushita Elec. Indus. Co., Ltd. v. Epstein,* 516 U.S. 367, 373, 116 S.Ct. 873, 877, 134 L.Ed.2d 6 (1996) (quoting 28 U.S.C. § 1738). Accordingly, "[f]ederal courts may not employ their own rules ... in determining the effect of the state judgment, but must accept the rules chosen by the State from which the judgment is taken." 516 U.S. at 373, 116 S.Ct. at 877 (internal quotation omitted).

Georgia collateral estoppel doctrine follows black-letter principles. Relying on the Restatement (Second) of Judgments (1982) ("Restatement"), the Georgia Supreme Court recently explained,

> [C]ollateral estoppel applies where an issue of fact or law is actually litigated and determined by a valid judgment, and the determination is essential to the judgment. That determination is then conclusive in a subsequent action between the same parties.

*Kent v. Kent,* 265 Ga. 211, 211, 452 S.E.2d 764, 766 (1995) (citing Restatement § 27).

Under Georgia law, collateral estoppel applies only where the antecedent judgment was a final judgment. *See, e.g., Quinn v. State,* 221 Ga.App. 399, 400, 471 S.E.2d 337, 339 (1996), *aff'd,* 268 Ga. 70, 485 S.E.2d 483 (1997); *Greene v. Transp. Ins. Co.,* 169 Ga.App. 504, 506, 313 S.E.2d 761, 763 (1984). If a trial court's judgment is not appealed, that order becomes final when the time to seek appellate review has expired. *See Reid v. Reid,* 201 Ga.App. 530, 533, 411 S.E.2d 754, 756 (1991).

The Georgia court's November 14 order, which ruled that venue and personal jurisdiction were lacking in Georgia, was not appealed. The order became final for collateral estoppel purposes on December 15. *See* O.C.G.A. § 5-6-38(a) (stating that notice of appeal must be filed within 30

days after entry of judgment). Under Georgia law, therefore, the Georgia court's judgment became final one full week *before* December 22, when the district court ruled on Mr. Lops's motion to dismiss. The timing prerequisites for collateral estoppel thus were satisfied.

If the Georgia court simply had dismissed the case for lack of venue and personal jurisdiction, then its order plainly would have had preclusive effect on other Georgia courts. As described in the Restatement, if a court dismisses a case for improper venue, collateral estoppel bars the plaintiff from attempting to bring the same suit in the same jurisdiction. *See* Restatement § 20 cmt. b illus. 1. Similarly, if a court dismisses a case for lack of personal jurisdiction, the specific jurisdictional determination of that court is binding on subsequent courts. *See N. Ga. Elec. Membership Corp. v. City of Calhoun, Ga.,* 989 F.2d 429, 433 (11th Cir.1993) (discussing federal collateral estoppel principles; "Although the dismissal of a complaint for lack of jurisdiction does not adjudicate the merits so as to make the case res judicata on the substance of the asserted claim, it does adjudicate the court's jurisdiction, and a second complaint cannot command a second consideration of the same jurisdictional claim.") (quoting *Boone v. Kurtz,* 617 F.2d 435, 436 (5th Cir.1980)). Accordingly, had the Georgia court simply dismissed the instant case for lack of venue and personal jurisdiction, collateral estoppel principles would have barred Mrs. Lops from refiling the same case in any Georgia state court. *Cf. Tyndale v. Mfrs. Supply Co.,* 209 Ga. 564, 74 S.E.2d 857 (1953) (holding that the second court was bound by the first court's determination that service was improper).

Because Georgia preclusion law governs the preclusive effect of a Georgia court's judgment in federal courts, *see* 28 U.S.C. § 1738, collateral estoppel likewise would have barred Mrs. Lops from bringing the same case before a *federal district court in Georgia* if the Georgia court simply had dismissed the case on the grounds that venue and personal jurisdiction were lacking in Georgia.

*See, e.g, Harbuck v. Marsh Block & Co.,* 896 F.2d 1327, 1329 (11th Cir.1990) ("Where the question of personal jurisdiction has been fully and fairly litigated and finally decided in state court ... that decision must be accorded full faith and credit in the federal court.").[12]

B.

The wrinkle here is that the Georgia court did not simply dismiss the case. Based on its venue and personal jurisdiction rulings, the Georgia court directed that the case be transferred to South Carolina: "All parties stipulated to a transfer of the proceedings verses [sic] dismissal and refiling in the event this Court found no authority for exercising jurisdiction in Georgia." Georgia court's Order of November 14, 1997, at 7 n.2. I believe, however, that the Georgia court lacked the authority to transfer Mrs. Lops's ICARA petition to the South Carolina court. Thus, I conclude that the Georgia court's order constituted a simple dismissal, plainly a final judgment with preclusive effect.[13]

The Georgia court was not authorized to transfer Mrs. Lops's ICARA petition to the court

---

[12]*See also Wiggins v. Pipkin,* 853 F.2d 841, 842 (11th Cir.1988); *Rubaii v. Lakewood Pipe of Tex., Inc.,* 695 F.2d 541, 543 (11th Cir.1983); *Deckert v. Wachovia Student Fin. Servs., Inc.,* 963 F.2d 816, 819 (5th Cir.1992). In each of *Wiggins, Rubai,* and *Deckert,* the court ruled that a state court order dismissing an action for lack of personal jurisdiction barred the plaintiff from bringing a diversity suit based on the same cause of action in federal court in the same state. In those cases, the state courts' personal jurisdiction determinations had preclusive effect on the federal courts because a federal courts sitting in diversity determine personal jurisdiction in the same way that the state courts do: by following state law. Similarly, the federal district court in this case had to determine venue and personal jurisdiction in the same way that the Georgia state court did: by examining the ICARA statute and federal due process guarantees. Thus, just as collateral estoppel precluded the federal district courts in *Wiggins, Rubai,* and *Deckert* from revisiting the state courts' jurisdictional rulings, so collateral estoppel should have precluded the federal district court in this case from revisiting the Georgia court's venue and personal jurisdiction rulings.

[13]In Parts II.C, II.D, and II.E, *infra,* I will demonstrate that even if the interstate transfer directive *was* effective, the Georgia court's order was a final judgment with corresponding preclusive effect.

of another state.  The federal ICARA statute itself does not sanction interstate transfers.  Likewise, Georgia does not have a general statutory provision allowing state courts to transfer cases to other states, *cf.* 20 Am.Jur.2d Courts § 130 (1995) (describing Uniform Transfer of Litigation Act, which Georgia has not adopted), or a specific statutory provision concerning the interstate transfer of ICARA cases.[14]  Similarly, the doctrine of forum non conveniens did not permit the Georgia court's interstate transfer.[15]  Accordingly, the interstate transfer directive issued by the Georgia court was unauthorized.  *Cf. Rogers v. Rogers,* 688 So.2d 421, 422 (Fla. 3d DCA 1997) (reversing an interstate transfer order that was not authorized under state law);  *United Carolina Bank v. Martocci,* 416

---

[14]Instead, Georgia law only authorizes interstate transfers in certain narrowly defined situations.  For example, O.C.G.A. § 15-11-44 authorizes the transfer of a child to the state of the child's residence if the child is adjudicated to be delinquent under the Uniform Juvenile Court Act. Also, the Uniform Child Custody Jurisdiction Act authorizes Georgia courts to stay child custody cases brought under that Act on the condition that a proceeding "be promptly commenced in another named state," *see* O.C.G.A. § 19-9-47(e)(2), and permits Georgia courts to forward relevant information to the receiving court, *see* O.C.G.A. § 19-9-47(h).  *See Mulle v. Yount,* 211 Ga.App. 584, 586, 440 S.E.2d 210, 213 (1993) (stating that O.C.G.A. § 19-9-47 authorizes interstate transfers).

[15]Forum non conveniens permits a court to resist imposition upon its jurisdiction even when jurisdiction is authorized by the letter of a statute.  *See Smith v. Bd. of Regents of the Univ. Sys. of Ga.,* 165 Ga.App. 565, 565, 302 S.E.2d 124, 125 (1983).  Forum non conveniens was inapplicable here because no specific Georgia statutory provision authorizes the doctrine in ICARA cases.  *See Holtsclaw v. Holtsclaw,* 269 Ga. 163, 163-64, 496 S.E.2d 262, 263 (1998) (stating that because the courts of Georgia have no inherent authority to decline to exercise jurisdiction granted by the Georgia Constitution, the doctrine of forum non conveniens is only available pursuant to specific Georgia statutory provisions).  Forum non conveniens also is inappropriate where, as here, the court determines that it lacks jurisdiction over the action.  *See, e.g.,* Fleming James, Jr. & Geoffrey C. Hazard, Jr., Civil Procedure, § 2.31, at 105 (3d ed.  1985) ("The forum non conveniens rule has application only if the court has jurisdiction, by virtue of "minimum contacts' or on some other basis.  If the jurisdictional contacts are lacking, the court must dismiss the action for that reason, even if an alternative forum were more convenient.").

   Moreover, even if forum non conveniens *had been* appropriate here, the doctrine would not have permitted the Georgia court to transfer the case to another state.  *Id.* at 107 ("The courts of one state ... may not transfer cases to courts of another state, and dismissal is the only device for implementing forum non conveniens on an interstate basis.").

Pa.Super. 16, 22-23, 610 A.2d 484, 487-88 (1992) (holding that Pennsylvania's intrastate transfer law does not authorize interstate transfers); *Bliss v. Bliss,* 343 Pa.Super. 17, 21, 493 A.2d 780, 782 (1985) (same).

Because the Georgia court entered an interstate transfer directive despite lacking the authority to do so, that directive is considered a nullity, *see Thomas v. Thomas,* 221 Ga. 652, 652, 146 S.E.2d 724, 725 (1966); *Skinner v. Skinner,* 172 Ga.App. 609, 610, 323 S.E.2d 905, 906 (1984), and "may be attacked any where and any time in any court," *see Palmer v. Bunn,* 218 Ga. 244, 245, 127 S.E.2d 372, 373 (1962). The Georgia court explicitly stated that the transfer directive was an alternative to simply dismissing the case. *See* Georgia court's Order of November 14, 1997, at 7 n.2. Thus, this court must characterize the Georgia court's order, absent the invalid transfer directive, to be a dismissal. *See In re Marriage of Clark,* 232 Ill.App.3d 342, 347, 173 Ill.Dec. 532, 597 N.E.2d 240, 243 (1992) (reasoning that because Illinois law only authorized intrastate transfers, the trial court's order transferring the case to another state constituted a simple dismissal); *see also In re Marriage of Kelso,* 173 Ill.App.3d 746, 751, 123 Ill.Dec. 352, 527 N.E.2d 990, 992 (1988) (describing a motion for interstate transfer as "more properly, a motion to dismiss"). As a dismissal, the Georgia court's order was a final judgment with preclusive effect.

Apparently conceding that no federal or Georgia law authorizes the interstate transfer of an ICARA case, the majority contends that the parties, through their stipulation, gave the Georgia court the power to transfer the case. Georgia black-letter law, however, long has been clear: Parties by agreement cannot provide a court with authority that it otherwise would have lacked. *See Dix v. Dix,* 132 Ga. 630, 632, 64 S.E. 790, 791 (1909) ("It is rudimentary law that parties can not, by consent express or implied, give jurisdiction to a court; that as to the subject-matter the court is limited by the powers conferred upon it by law, and can not be given additional power or jurisdiction by

consent of the parties or by waiver."), *cited in Mitchell v. Mitchell,* 220 Ga.App. 682, 683, 469 S.E.2d 540, 542 (1996).

Finally, the majority argues that Mr. Lops, having stipulated to the transfer, may not challenge its legality. A null order of a Georgia court, however, "may be attacked any where and any time in any court." *See Palmer v. Bunn,* 218 Ga. 244, 245, 127 S.E.2d 372, 373 (1962). Moreover, it is *Mrs. Lops,* not Mr. Lops, who has altered her legal position. Mr. Lops consistently has contended that this case should have been brought in South Carolina, not Georgia. By contrast, Mrs. Lops, having stipulated to the transfer of the case to South Carolina based on the Georgia court's finding that venue and jurisdiction were *lacking* in Georgia, filed suit in the federal district court in Georgia, where she argued that venue and jurisdiction *did exist* in Georgia. Georgia preclusion law prohibited Mrs. Lops from changing her position in this manner. *See Thompson v. Thompson,* 237 Ga. 509, 509, 228 S.E.2d 886, 887 (1976) ("[P]arties to stipulations and agreements entered into in the course of judicial proceedings will not be permitted to take positions inconsistent therewith in the absence of fraud, duress or mistake."); *Ghrist v. Fricks,* 219 Ga.App. 415, 417, 465 S.E.2d 501, 504 (1995) (applying collateral estoppel to the mother's statement of paternity contained in a settlement agreement because "[p]arties to stipulations and agreements entered into in the course of judicial proceedings are estopped from taking positions inconsistent therewith") (quotation omitted).[16]

C.

---

[16]Contrary to the majority's characterization of my dissent, my position is not that Mrs. Lops "stipulated that venue was improper and that personal jurisdiction was wanting in Georgia." Rather, Mrs. Lops's stipulation was based on the *Georgia court's judgment* that venue and personal jurisdiction were lacking in Georgia. Because the basis for Mrs. Lops's stipulation in the Georgia court was inconsistent with her later arguments regarding venue and personal jurisdiction in the district court, the principle of collateral estoppel applies. *See Ghrist,* 219 Ga.App. at 417, 465 S.E.2d at 504.

Even assuming, *arguendo,* that the Georgia court's interstate transfer directive was effective, the Georgia court's order was a final judgment entitled to preclusive effect. In my view, Georgia's collateral estoppel doctrine does not permit a contrary conclusion.

The purpose of Georgia collateral estoppel doctrine is judicial economy. As the Georgia Supreme Court has explained, collateral estoppel "applies where an issue of fact or law is actually litigated and determined by a valid judgment, and the determination is essential to the judgment." *Kent v. Kent,* 265 Ga. 211, 211, 452 S.E.2d 764, 766 (1995) (citing Restatement § 27). By according preclusive effect to final judgments, *see Quinn v. State,* 221 Ga.App. 399, 400, 471 S.E.2d 337, 339 (1996), *aff'd,* 268 Ga. 70, 485 S.E.2d 483 (1997), Georgia's collateral estoppel law serves to protect "litigants from the burden of relitigating an identical issue with the same party or his privy and [to promote] judicial economy by preventing needless litigation." *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326, 99 S.Ct. 645, 649, 58 L.Ed.2d 552 (1979), *quoted in Matter of Gill,* 181 B.R. 666, 670 (Bankr.N.D.Ga. Apr.14, 1995) (describing the rationale for Georgia's collateral estoppel doctrine); *see Bowman v. Bowman,* 215 Ga. 560, 561-62, 111 S.E.2d 226, 227-28 (1959) (concluding that the need for finality justifies the imposition of res judicata; stating that the ancient maxim "It is of advantage to the public that there be an end of litigation" represents a policy "so essential as not to admit of question or dispute"); *Lankford v. Holton,* 196 Ga. 631, 633, 27 S.E.2d 310, 312 (1943) ("One of the prime objects of judicial procedure is to forever settle and end disputes between litigants, and courts never look with favor on the unnecessary prolongation of litigation, and particularly disapprove attempts to ignore or evade binding judgments.").

This court must accord preclusive effect to the Georgia court's venue and personal jurisdiction rulings in order to fulfill the purpose of Georgia collateral estoppel doctrine. The Georgia court "actually litigated and determined" the issues of venue and personal jurisdiction,

which were "essential to [its] judgment." *Kent,* 265 Ga. at 211, 452 S.E.2d at 766 (citing Restatement § 27). Moreover, an examination of the implications of the majority's ruling reveals that the Georgia court's order was, necessarily, a *final* judgment with preclusive effect.

Under the majority's holding, if a state or federal court in Georgia transfers a case to another state for lack of venue and personal jurisdiction, then the plaintiff may bring the same action again in any state or federal court in Georgia and relitigate the issues of venue and personal jurisdiction. Indeed, if that court transfers the case again for the same reason, the plaintiff may refile once more in state or federal court in Georgia and relitigate the same issues. According to the majority's logic, only when a transferred case reaches final judgment in another state would the plaintiff become unable to relitigate the issues of venue and personal jurisdiction before state or federal courts in Georgia.

The majority's holding is thus contrary to judicial economy, the core purpose of Georgia collateral estoppel doctrine. *See Matter of Gill,* 181 B.R. 666, 670 (Bankr.N.D.Ga. Apr.14, 1995) (citing *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326, 99 S.Ct. 645, 649, 58 L.Ed.2d 552 (1979)); *Bowman v. Bowman,* 215 Ga. 560, 561-62, 111 S.E.2d 226, 227-28 (1959); *Lankford v. Holton,* 196 Ga. 631, 633, 27 S.E.2d 310, 312 (1943). Indeed, it also is contrary to principles of preclusion long-established in Anglo-American jurisprudence. *See* Restatement Ch. 1 at 11 ("The convention concerning finality of judgments has to be accepted, certainly if there is to be practical meaning to the idea that legal disputes can be resolved by legal process."). Unlike the majority, I do not believe that another Superior Court of the State of Georgia would allow Mrs. Lops to refile her ICARA suit and relitigate the Georgia court's venue and personal jurisdiction rulings. Instead, that Superior Court would recognize the Georgia court's original order to be a final judgment with preclusive effect. Accordingly, I conclude that the district court was required to dismiss the case

pursuant to the Full Faith and Credit Act, 28 U.S.C. § 1738.

D.

My conclusion also is compelled by a close examination of Georgia law concerning the finality requirement of collateral estoppel doctrine. As the majority notes, no Georgia court has ruled whether an order containing an interstate transfer directive is a final judgment to be accorded preclusive effect. This apparent gap in the law is quite understandable, however. As described in Part II.B, *supra,* Georgia courts generally are *not authorized* to transfer cases to another state. Logically, therefore, Georgia courts have had little opportunity to determine the preclusive effect of interstate transfer orders. Nonetheless, I believe that the Georgia Supreme Court, if faced with the question, would rule that the Georgia court's order in this case was a final judgment for collateral estoppel purposes.

Under Georgia law, judgments that are final for collateral estoppel purposes include, but are not limited to, those judgments that are final for appealability purposes.[17] Georgia's appealability

---

[17]Relying on *Culwell v. Lomas & Nettleton Co.,* 242 Ga. 242, 248 S.E.2d 641 (1978), this court has stated that, under Georgia law, "finality for res judicata purposes is measured by the same standard as finality for appealability purposes" and that the finality requirement is not "relaxed for purposes of collateral estoppel." *See Gresham Park Community Org. v. Howell,* 652 F.2d 1227, 1242 & n. 43 (5th Cir. Unit B Aug. 10, 1981); *Culwell,* 248 S.E.2d at 642 (1978) (stating that the entry of a judgment as to one or more but fewer than all of the claims and parties is neither an appealable final judgment nor a judgment entitled to res judicata effect unless the trial court makes an express direction for the entry of the final judgment and a determination that no just reason for delaying the finality of the judgment exists); *see also Dep't of Corrections v. Robinson,* 216 Ga.App. 508, 509, 455 S.E.2d 323, 324 (1995) ("A superior court order remanding a case back to an administrative tribunal is not an appealable final judgment and thus is not binding for res judicata purposes.") (citations omitted).

Certain judgments, however, may be final for purposes of preclusion even though they are not appealable final judgments. In *Studdard v. Satcher, Chick, Kapfer, Inc.,* 217 Ga.App. 1, 456 S.E.2d 71 (1995), the court noted that although a voluntary dismissal with prejudice is a final judgment for res judicata purposes, *see id.* at 2 n. 2, 456 S.E.2d at 73 n. 2 (citing *Fowler v. Vineyard,* 261 Ga. 454, 405 S.E.2d 678 (1991)), "we have found no cases which clearly hold that a voluntary dismissal with prejudice constitutes a "final

statute provides in part:

> (a) Appeals may be taken to the Supreme Court and the Court of Appeals from the following judgments and rulings of the superior courts, the constitutional city courts, and such other courts or tribunals from which appeals are authorized by the Constitution and laws of this state:
>
> > (1) All *final judgments, that is to say, where the case is no longer pending in the court below,* except as provided in Code Section 5-6-35.

*See* O.C.G.A. § 5-6-34 (emphasis added). Accordingly, I turn to the question of whether a Georgia court's order transferring a case to another state causes the case to be "no longer pending in the court below." O.C.G.A. § 5-6-34(a)(1).

Without citing any authority for its conclusion, the majority states that "the court below" refers to *any* trial court, including the trial court of another state. In my view, however, the plain language, legislative history, and judicial interpretations of O.C.G.A. § 5-6-34(a)(1) all demand the conclusion that "the court below" refers to a lower court *in the State of Georgia.* Therefore, a Georgia court's order that effectively transfers a case to another state renders the case "no longer pending in the court below." Such an order is a final judgment for appealability purposes and, consequently, for collateral estoppel purposes.

A plain reading of the statute indicates that the phrase "the court below" in O.C.G.A. § 5-6-34(a)(1) refers to a lower court of the State of Georgia. Section 5-6-34(a)(1) and the immediately preceding § 5-6-34(a), considered together, have three elements. First, they describe the courts *to* which an "[a]ppeal[ ] may be taken," namely the Georgia Supreme Court and the Georgia Court of Appeals. *See* O.C.G.A. § 5-6-34(a). Second, they describe the courts *from* which an appeal may

---

judgment' as that term is used in the appellate practice act," *Studdard,* 456 S.E.2d at 73 n. 2. Based on *Gresham Park* and *Studdard,* I conclude that judgments that are final for collateral estoppel purposes include, but are not limited to, those judgments that are final for appealability purposes.

be taken, namely "the superior courts, the constitutional city courts, and such other courts or tribunals from which appeals are authorized by the Constitution and laws of this state." O.C.G.A. § 5-6-34(a). Third, they establish *when* an appeal may be taken, namely when "the case is no longer pending in the court below." O.C.G.A. § 5-6-34(a)(1).

The logical meaning of "the court below" in § 5-6-34(a)(1) is the court from which an appeal is taken to the Georgia Supreme Court or the Georgia Court of Appeals. According to § 5-6-34(a), the court from which such an appeal is taken is necessarily a lower court of the State of Georgia: a superior court, a constitutional city court, or one of the "other courts or tribunals from which appeals are authorized by the Constitution and laws of this state." *Thus, a case is only "pending in the court below" for purposes of O.C.G.A. § 5-6-34(a)(1) if it is pending in a lower court of the State of Georgia.*

The Georgia court's order purported to transfer the case in its entirety to the South Carolina court. Assuming, as does the majority, that this transfer directive was effective, the Georgia court's order rendered the case "no longer pending" in the lower courts of the State of Georgia. Thus, according to the plain language of O.C.G.A. § 5-6-34(a)(1), the Georgia court's order was a final judgment.

The legislative history of O.C.G.A. § 5-6-34(a)(1) reinforces this conclusion. The statutory precursor of O.C.G.A. § 5-6-34(a)(1) was Ga.Code Ann. § 6-701, which provided in part:

> No cause shall be carried to the Supreme Court or Court of Appeals upon any bill of exceptions while the same is pending in the court below, unless the decision or judgment complained of, if it had been rendered as claimed by the plaintiff in error, would have been a final disposition of the cause or final as to some material party thereto.

The structure of Ga.Code Ann. § 6-701 reveals that "the court below" refers to the court from which an appeal is taken to the Supreme Court or Court of Appeals. Because it is beyond dispute that an appeal cannot be taken to these courts from courts outside of the State of Georgia, "the court below"

necessarily refers to a lower court within the State of Georgia.

When O.C.G.A. § 5-6-34(a)(1) replaced Ga.Code Ann. § 6-701, *see* 1965 Ga. Laws at 18, § 1, the meaning of "the court below" did not change. As the Georgia Court of Appeals has ruled, O.C.G.A. § 5-6-34(a)(1) only restates the original language of Ga.Code Ann. § 6-701 "in somewhat different terminology.... [N]o change in result was intended." *Munday v. Brissette,* 113 Ga.App. 147, 151, 148 S.E.2d 55, 60, *rev'd on other grounds,* 222 Ga. 162, 149 S.E.2d 110 (1966) (citing E. Freeman Leverett, The Appellate Procedure Act of 1965, 1 Ga. State Bar Journal 451, 456 (1965)). Accordingly, the legislative history of O.C.G.A. § 5-6-34(a)(1) also supports the conclusion that "the court below" refers to a lower court in the State of Georgia.

Finally, Georgia case-law confirms this interpretation of "the court below." Georgia appellate courts have held that an *intrastate* transfer from one Georgia Superior Court to another is *not* a final judgment and therefore not appealable. *See Wright v. Millines,* 212 Ga.App. 453, 454, 442 S.E.2d 304, 304 (1994); *Griffith v. Ga. Bd. of Dentistry,* 175 Ga.App. 533, 533, 333 S.E.2d 647, 647 (1985); *see also* Ga. Const. of 1983, art. VI, § 1, ¶ 8; Georgia Uniform Transfer Rules. The rationale for this rule is that *from the perspective of the Georgia appellate courts,* a case that is transferred from one Georgia Superior Court to another remains "pending in the court below." In *Griffith,* for example, the court explained that an order transferring a case from one Georgia Superior Court to another was not a final judgment because the case remained pending in a "court below" the Georgia Court of Appeals. *See* 175 Ga.App. at 533, 333 S.E.2d at 647 ("The subject transfer order is not a final judgment as the case is still pending in the court below, albeit a different court from the one ordering the transfer."). By contrast, a case that is transferred to another state's court is no longer appealable to a Georgia appellate court. Thus, from the perspective of the Georgia appellate courts, an interstate transfer order renders a case "no longer pending in the court below" and is a

final judgment appealable under O.C.G.A. § 5-6-34(a)(1).

The sparse Georgia case-law concerning interstate transfer orders further bolsters my conclusion that such orders are final judgments for appealability purposes. Even though Georgia courts generally are not authorized to transfer cases to another state, *see supra* Part II.B, relevant cases have arisen under two Georgia statutes that do provide for interstate transfers. First, Georgia's Uniform Child Custody Jurisdiction Act ("UCCJA") provides that a court with jurisdiction under the UCCJA may transfer the case to another state if it finds that Georgia is an inconvenient forum and that a court of another state would be more appropriate.[18] In *Arnold v. Jordan,* 190 Ga.App. 8, 378 S.E.2d 139 (1989), the Georgia Court of Appeals reviewed a Georgia Superior Court's order that a child custody case be transferred to Texas pursuant to the UCCJA. *See id.* at 10, 378 S.E.2d at 141. In describing its assumption of jurisdiction over the case, the Georgia Court of Appeals stated simply that it had "granted the father's application for *discretionary review.*" *Id.* (emphasis added).[19] This language indicates that the father did not have to comply with Georgia's interlocutory review procedures.[20] *Cf. Avera v. Avera,* 268 Ga. 4, 4, 485 S.E.2d 731, 732 (1997) (reviewing on appeal the trial court's order in a divorce action and stating, "This court granted Wife's application for

---

[18]*See* O.C.G.A. § 19-9-47(e)(2) (authorizing Georgia courts to stay child custody cases brought under the UCCJA on the condition that a similar proceeding be brought in the court of another named state); O.C.G.A. § 19-9-47(h)(permitting Georgia courts to forward relevant information to receiving courts in other states); *see also Mulle v. Yount,* 211 Ga.App. 584, 586, 440 S.E.2d 210, 213 (1993) (stating that O.C.G.A. § 19-9-47 authorizes interstate transfers).

[19]Appeals from judgments and orders in all "domestic relations" cases are discretionary. *See* O.C.G.A. § 5-6-35(a)(2).

[20]A party seeking discretionary review from an interlocutory order must comply with interlocutory review procedures, such as obtaining from the trial court a certificate of immediate review pursuant to O.C.G.A. § 5-6-34(b). *See Scruggs v. Ga. Dep't of Human Resources,* 261 Ga. 587, 588, 408 S.E.2d 103, 104 (1991); *see also Wieland v. Wieland,* 216 Ga.App. 417, 418, 454 S.E.2d 613, 614 (1995) (dismissing a discretionary appeal from an interlocutory order because the appellant failed to comply with interlocutory review procedures).

*interlocutory discretionary review* of the trial court's order.") (emphasis added).[21] Therefore, *Arnold* demonstrates that an interstate transfer by a Georgia trial court is a final, not interlocutory, order for appealability purposes.

A second statute, Georgia's Uniform Juvenile Court Act ("UJCA"), authorizes a court to transfer a child to the state of the child's residence if the child is adjudicated to be delinquent. *See* O.C.G.A. § 15-11-44. The Georgia Supreme Court has ruled that such interstate transfers are appealable final judgments. *See In the Interest of T.L.C.,* 266 Ga. 407, 407, 467 S.E.2d 885, 886 (1996); *G.W. v. State,* 233 Ga. 274, 275-76, 210 S.E.2d 805, 807 (1974). In my view, *T.L.C.* and *G.W.* provide further support for the conclusion that the Georgia court's interstate transfer order in this case was a final judgment under O.C.G.A. § 5-6-34(a)(1).

The test for determining whether juvenile court orders are final judgments and thus appealable is the same standard found in O.C.G.A. § 5-6-34(a)(1). *See* O.C.G.A. § 15-11-64 ("In all cases of final judgments of a juvenile court judge, appeals shall be taken to the Courts of Appeals or the Supreme Court in the same manner as appeals from the superior court."); *J.T.M. v. State,* 142 Ga.App. 635, 636, 236 S.E.2d 764, 765 (1977) (applying the standard of whether the case is "no longer pending in the court below," *see* O.C.G.A. § 5-6-34(a)(1), in determining whether a juvenile court judgment is an appealable final judgment). Even though a juvenile court order adjudicating delinquency and transferring the case to another court *within* Georgia for disposition is not a final judgment, *see D.C.E. v. State,* 130 Ga.App. 724, 724-25, 204 S.E.2d 481, 481-82 (1974); *In the Interest of G.C.S.,* 186 Ga.App. 291, 291, 367 S.E.2d 103, 104 (1988), a juvenile court order adjudicating delinquency and transferring the case to *another state* for disposition *is* a final

---

[21]*Avera* thus belies the majority's assertion that "*Arnold* 's reference to "discretionary review' could be read to" mean that the interstate transfer order in *Arnold* was an interlocutory order.

judgment, *see In the Interest of T.L.C.,* 266 Ga. 407, 407, 467 S.E.2d 885, 886 (1996); *G.W. v. State,* 233 Ga. 274, 275-76, 210 S.E.2d 805, 807 (1974). Noting the constitutional imperative of according appellate review to juveniles whose cases are transferred out of state, the *G.W.* court explained that an interstate transfer order is an appealable final judgment because it is the last order to be issued by any Georgia court regarding the case:

> The judgment appealed from in this case was the *final judgment to be entered in the case by any court in Georgia* and therefore, unlike the cases relied upon where the case was transferred to another Georgia court for final disposition, it was subject to review without a certificate authorizing immediate review.

233 Ga. at 275-76, 210 S.E.2d at 807 (emphasis added); *see also T.L.C.,* 266 Ga. 407, 467 S.E.2d at 886 (citing *G.W.,* 233 Ga. at 275-76, 210 S.E.2d at 807).

The majority attempts to limit the holdings of *G.W.* and *T.L.C.* on the grounds that the *G.W.* court mentioned equal protection concerns prior to reaching its conclusion. Subsequent opinions that have described the *G.W.* court's holding regarding final judgments, however, do not even mention equal protection. In *T.L.C.,* for example, the court simply cited the *G.W.* court's conclusion that an interstate transfer order was appealable because it was "the final judgment to be entered in the case by any court in Georgia." *See T.L.C.,* 266 Ga. 407, 467 S.E.2d at 886 (citing *G.W.,* 233 Ga. at 275-76, 210 S.E.2d at 807). Similarly, the Georgia Court of Appeals recently described *T.L.C.* and *G.W.* as follows:

> In our view, the order appealed from in the case *sub judice* is not a final order, for it does not render a judgment of adjudication and disposition on the allegations contained in the petition for delinquency. Rather, it holds all charges in abeyance during a period of good behavior. Upon successful completion of that period of good behavior, all charges will be dismissed. Compare *In the Interest of T.L.C.,* 266 Ga. 407, 467 S.E.2d 885 (adjudication of delinquency and transfer to the juvenile court of Russell County, Alabama, was directly appealable because it "was the final judgment to be entered in the case by any court in Georgia...."); *G.W. v. State of Ga.,* 233 Ga. 274, 276, 210 S.E.2d 805 (adjudication of delinquency and transfer to county of residence of nonresidents of Georgia was the "final judgment to be entered in the case by any court in Georgia and therefore, unlike the cases ... where the case was transferred to another Georgia court for final disposition, ... was subject to review

without a certificate authorizing immediate review.").  Since the order appealed from is not the final judgment to be entered in the case by any court in Georgia, this appeal is premature, and the case must be dismissed without prejudice.

*In Interest of M.T.,* 223 Ga.App. 615, 616, 478 S.E.2d 428, 429 (1996); *see also Sanchez v. Walker County Dept. of Family and Children Servs.,* 235 Ga. 817, 818, 221 S.E.2d 589, 589 (1976).

Accordingly, although the *G.W.* court did refer to equal protection concerns, *G.W.* and its progeny stand for the proposition that an interstate transfer order, being the last order entered by any court in Georgia, is a final judgment for appealability purposes.  Because the test for determining whether juvenile court orders are appealable final judgments is the same standard employed under O.C.G.A. § 5-6-34(a)(1), *see* O.C.G.A. § 15-11-64; *J.T.M. v. State,* 142 Ga.App. 635, 636, 236 S.E.2d 764, 765 (1977), these cases from the juvenile court context reinforce my conclusion that an order containing an interstate transfer directive is an appealable final judgment under O.C.G.A. § 5-6-34(a)(1).

As the majority points out, an intrastate transfer order that changes the fundamental nature of a proceeding also is deemed a final judgment for appealability purposes.[22]  This observation,

---

[22]For example, an intrastate transfer of a criminal case from juvenile to superior court is an appealable final judgment.  *See Rivers v. State,* 229 Ga.App. 12, 13, 493 S.E.2d 2, 4 (1997); *J.T.M. v. State of Ga.,* 142 Ga.App. 635, 636, 236 S.E.2d 764, 765 (1977).  As the Georgia Supreme Court has explained,

> *J.T.M. v. State of Ga.* ... deals with the appealability of a transfer order in a criminal context which determines whether the defendant will be treated as a juvenile and tried for delinquency under the applicable juvenile provisions, or whether he will be treated as an adult and prosecuted under the criminal laws of this state.... [A] criminal transfer order ... is determinative as to the "juvenile" aspect of the case and thus may be final and reviewable.

*Fulton County Dep't of Family & Children Servs. v. Perkins,* 244 Ga. 237, 239, 259 S.E.2d 427, 428-29 (1978).  Distinguishing *J.T.M.,* the *Perkins* court held that an intrastate transfer of a child custody case from juvenile to superior court is not a final judgment because it "changes the forum but [ ] not [ ] the nature of the proceeding, to wit:  the determination of child custody."  *See* 244 Ga. at 239-40, 259 S.E.2d at 429.

however, casts no doubt whatsoever on my conclusion that an effective interstate transfer order is a final judgment under O.C.G.A. § 5-6-34(a)(1) because it renders the case "no longer pending in the court below."

Accordingly, all relevant evidence from Georgia law points unambiguously to the same conclusion: A case is "pending in the court below," *see* O.C.G.A. § 5-6-34(a)(1), only if it remains in one of the lower Georgia courts. Conversely, if a Georgia court issues a legitimate *interstate* transfer order, that order renders the case "no longer pending in the court below," and thus the order is appealable, *see* O.C.G.A. § 5-6-34(a)(1), and entitled to preclusive effect, *see Gresham Park Community Org. v. Howell,* 652 F.2d 1227, 1242 & n. 43 (5th Cir. Unit B Aug.10, 1981). Therefore, even assuming, *arguendo,* that the Georgia court's interstate transfer directive was effective, the district court should have accorded preclusive effect to the Georgia court's venue and personal jurisdiction determinations.

## E.

The fact that the parties conditionally stipulated to the interstate transfer does nothing to alter my conclusion that the Georgia court's order was a final judgment with preclusive effect. Collateral estoppel "applies where an issue of fact or law is actually litigated and determined by a valid judgment, and the determination is essential to the judgment." *Kent v. Kent,* 265 Ga. 211, 211, 452 S.E.2d 764, 766 (1995) (citing Restatement § 27). Here, the parties stipulated to the interstate transfer *in the event* that the court determined that it lacked jurisdiction over the case. Because the

---

Despite the fact that *Perkins* involves only an *intrastate* transfer, the majority cites *Perkins* for the proposition that an *interstate* transfer order is not a final judgment because it changes only the forum and not the nature of the proceeding. I believe that the majority's attempted reliance on *Perkins* is misplaced. *Perkins* only indicates that certain *intrastate* transfer orders are appealable final judgments. *Perkins* is not relevant, even tangentially, to the question of whether an *interstate* transfer order renders a case "no longer pending in the court below" under O.C.G.A. § 5-6-34(a)(1).

Georgia court's venue and personal jurisdiction rulings were "essential to the judgment," collateral estoppel necessarily applies to those rulings.

Indeed, the parties' conditional stipulation only strengthens my conclusion that the Georgia court's order must be accorded preclusive effect. The transfer to which Mrs. Lops stipulated was based on the Georgia court's rulings that venue and personal jurisdiction were *lacking* in Georgia. Georgia preclusion principles prohibited Mrs. Lops from refiling the same action in a state or federal court in Georgia and claiming that venue and personal jurisdiction *existed* in Georgia. *See Thompson v. Thompson,* 237 Ga. 509, 509, 228 S.E.2d 886, 887 (1976) ("[P]arties to stipulations and agreements entered into in the course of judicial proceedings will not be permitted to take positions inconsistent therewith in the absence of fraud, duress or mistake."); *Ghrist v. Fricks,* 219 Ga.App. 415, 417, 465 S.E.2d 501, 504 (1995) (applying collateral estoppel to mother's statement of paternity contained in settlement agreement because "[p]arties to stipulations and agreements entered into in the course of judicial proceedings are estopped from taking positions inconsistent therewith") (quotation omitted); *see also Great Atl. Ins. Co. v. Morgan,* 161 Ga.App. 680, 683, 288 S.E.2d 287, 289 (1982) (stating that collateral estoppel applies to consent judgments).

Finally, even assuming that Mrs. Lops, by stipulating to the transfer, lost the right to appeal the Georgia court's venue and personal jurisdiction rulings, those rulings are nonetheless binding on subsequent courts. As the Georgia Supreme Court stated in *Kent,*

> We need not determine whether the contempt court's order was, on its face, appealable. *It was the husband's duty to obtain an appealable order on that issue, and to the extent he did not, he cannot now argue that collateral estoppel should not apply.*

265 Ga. at 212 n. 3, 452 S.E.2d at 766 n. 3 (emphasis added). Thus, even assuming that Mrs. Lops failed to obtain an appealable order from the Georgia court, she may not claim that the Georgia

court's venue and personal jurisdiction rulings are not entitled to preclusive effect in federal court.[23]

F.

The majority, citing *Fierer v. Ashe,* 147 Ga.App. 446, 249 S.E.2d 270 (1978), would hold in the alternative that this court should apply the "manifest injustice" exception to the collateral estoppel doctrine. I disagree. In *Fierer,* the court noted that certain courts have "occasionally rejected or qualified [preclusion principles] in cases in which an inflexible application would have violated an overriding public policy or resulted in manifest injustice to a party." *See id.* at 449-50, 249 S.E.2d at 273 (citing 1B Moore's Federal Practice 783, ¶ O.405(11)). The *Fierer* court, however, characterized the manifest injustice exception as "narrow" and "obscure," *see* 147 Ga.App. at 450, 249 S.E.2d at 273, and, without deciding whether the exception applied in the securities context, ruled that the appellees failed to meet their burden of proof, *see id.*

In my view, applying such a "narrow" and "obscure" exception to the facts of this case would be a grave mistake. Rather than appeal the Georgia court's venue and jurisdictional rulings, Mrs. Lops herself stipulated that the case be transferred to the South Carolina court. Subsequently, dissatisfied by the South Carolina court's oral statement on December 2 that it would place the children with Mr. Lops's mother during the pendency of the proceedings, Mrs. Lops brought suit in federal district court in Georgia. Mrs. Lops's actions constitute a flagrant attempt to use the federal court system to circumvent the Georgia court's venue and personal jurisdiction rulings. Accordingly, applying the manifest injustice exception in Mrs. Lops's favor would be most

---

[23]The Georgia court's order, which transferred the case pursuant to Mrs. Lops's stipulation, was similar to a voluntary dismissal with prejudice. A voluntary dismissal with prejudice *is* a final judgment for preclusion purposes, *see Fowler v. Vineyard,* 261 Ga. 454, 456, 405 S.E.2d 678, 680 (1991), even though it may *not* be appealable, *see Studdard v. Satcher, Chick, Kapfer, Inc.,* 217 Ga.App. 1, 2 n. 2, 456 S.E.2d 71, 73 n. 2 (1995) ("[W]e have found no cases which clearly hold that a voluntary dismissal with prejudice constitutes a "final judgment' as that term is used in the appellate practice act.").

inappropriate.

Moreover, the apparent soundness of the district court's ruling on the merits of the ICARA petition does not suggest that reversing the district court's decision would be manifestly unjust. The South Carolina court has not yet ruled on the merits of Mrs. Lops's ICARA petition, and Mrs. Lops has not suggested that the South Carolina court lacks competence to determine an ICARA petition. If the facts in this case are as the district court found them, then the South Carolina court would have reached the same conclusion. For this court to presume otherwise would constitute an affront to the efficacy of the South Carolina court system.

The majority also states that the Georgia court's order should not be accorded preclusive effect because the order was based on an erroneous interpretation of the ICARA statute. Although I agree that the Georgia court misinterpreted the ICARA statute, I dispute the majority's interpretation of Georgia preclusion law. Georgia courts consistently and unambiguously have held that even erroneous judgments must be accorded preclusive effect. *See Chilivis v. Dasher,* 236 Ga. 669, 670, 225 S.E.2d 32, 33-34 (1976) (stating that collateral estoppel applies "regardless of the correctness of [the] rulings"); *Kilgo v. Keaton,* 227 Ga. 563, 564, 181 S.E.2d 821, 822 (1971) (giving preclusive effect to a prior judgment "however irregular or erroneous"); *Johnston v. Duncan,* 227 Ga. 298, 298, 180 S.E.2d 348, 349 (1971) (holding that res judicata applies "[r]egardless of the correctness of [the former] decision"); *Lankford v. Holton,* 196 Ga. 631, 633-34, 27 S.E.2d 310, 312 (1943) (stating that the importance of finality requires giving preclusive effect even to erroneous decisions). In my view, the majority has misrepresented Georgia law by holding to the contrary.

All relevant legal authority thus confirms that the district court should not have assumed jurisdiction over this case. The Georgia court explicitly held that venue was improper in Georgia

and that personal jurisdiction did not lie in Georgia. Even assuming that the Georgia court had the authority to transfer the case to South Carolina, the case, once transferred, was "no longer pending in the courts below," O.C.G.A. § 5-6-34(a)(1), because Georgia appellate courts no longer had jurisdiction over it. Under Georgia law, therefore, the Georgia court's order was a final judgment that barred Mrs. Lops from relitigating the issues of venue and personal jurisdiction in any Georgia state court. Accordingly, Mrs. Lops was barred from suing again in federal district court in Georgia. *See Matsushita Elec. Indus. Co., Ltd. v. Epstein,* 516 U.S. 367, 373, 116 S.Ct. 873, 877, 134 L.Ed.2d 6 (1996) (interpreting the Full Faith and Credit Act, 28 U.S.C. § 1738, as mandatory).

III.

Even if the district court was not precluded from assuming jurisdiction over this case, the district court was faced with the question of whether to stay the case in deference to the South Carolina court pursuant to the doctrine enunciated in *Colo. River Water Conservation Dist. v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), and related cases. Because Mrs. Lops's federal suit was reactive to the state court proceedings, *see infra* Part III.C, and contrary to federal removal policy, *see infra* Part III.D, I conclude that the district court abused its discretion in failing to stay the instant action in deference to the South Carolina court. Furthermore, given that the South Carolina court already has held hearings on the merits of Mrs. Lops's ICARA petition, *see infra* Part III.E, we should vacate the district court's judgment and direct it to stay Mrs. Lops's federal action, *see infra* Part III.F.[24]

_____

[24]Although the Supreme Court expressly has reserved the question of whether a stay or dismissal is appropriate when the *Colorado River* doctrine is invoked, *see Arizona v. San Carlos Apache Tribe of Ariz.,* 463 U.S. 545, 570 n. 21, 103 S.Ct. 3201, 3215 n. 21, 77 L.Ed.2d 837 (1983), the Court has hinted strongly that a district court, in deferring to the state court, should keep the federal forum open if necessary, *see id.; see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 28, 103 S.Ct. 927, 943, 74 L.Ed.2d 765 (1983). The choice between a stay and a dismissal will have no practical effect if all issues are in fact resolved by

A.

Considerations of "wise judicial administration" may warrant that a federal district court

defer[25] to parallel state proceedings. *See Colo. River,* 424 U.S. at 818, 96 S.Ct. at 1246 (quotation

omitted). In light of the "virtually unflagging" obligation of the federal courts to exercise their

jurisdiction, *see id.* at 817, 96 S.Ct. at 1246, such deference to state courts should occur only under

"exceptional" circumstances and when warranted by "the clearest of justifications," *id.* at 818-19,

96 S.Ct. at 1246-47. The *Colorado River* Court listed four illustrative factors to be considered in

determining whether exceptional circumstances exist: (1) whether one of the courts has assumed

jurisdiction over property; (2) the inconvenience of the federal forum; (3) the potential for

---

the state proceeding. *See Bd. of Educ. of Valley View Community Unit Sch. Dist. No. 365U v. Bosworth,* 713 F.2d 1316, 1322 (7th Cir.1983). In the event that issues remain unresolved in the state court, however, only a stay ensures that the federal court will meet its "unflagging duty" to exercise its jurisdiction, *see Colorado River,* 424 U.S. at 817, 96 S.Ct. at 1246, because, unlike a dismissal, a stay avoids the risk that the plaintiff will be time-barred from reinstating the federal suit, *see Lumen Constr., Inc. v. Brant Constr. Co., Inc.,* 780 F.2d 691, 698 (7th Cir.1985).

　　　　Accordingly, I believe that the district court should have stayed, not dismissed, the instant action. *See Attwood v. Mendocino Coast Dist. Hosp.,* 886 F.2d 241, 245 (9th Cir.1989)(holding that a stay is the proper procedural mechanism for a district court to employ when deferring to a parallel state-court proceeding); *LaDuke v. Burlington N. R.R. Co.,* 879 F.2d 1556, 1562 (7th Cir.1989) (same); *see also Noonan S., Inc. v. County of Volusia,* 841 F.2d 380, 383 (11th Cir.1988) ("The dismissal of an action in deference to parallel state proceedings is an extraordinary step that should not be undertaken absent a danger of a serious waste of judicial resources.").

[25]The *Colorado River* doctrine is not a recognized form of abstention. *See Colo. River,* 424 U.S. at 817, 96 S.Ct. at 1246. Unlike traditional abstention doctrines, which rest on "regard for federal-state relations" and "considerations of proper constitutional adjudication," the *Colorado River* doctrine is based on "considerations of "[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.' " *Id.* (quoting *Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co.,* 342 U.S. 180, 183, 72 S.Ct. 219, 221, 96 L.Ed. 200 (1952)). Accordingly, I use the term "deference" rather than "abstention" to describe the *Colorado River* doctrine. *See Fed. Deposit Ins. Corp. v. Nichols,* 885 F.2d 633, 637 (9th Cir.1989). *But see Fuller Co. v. Ramon I. Gil, Inc.,* 782 F.2d 306, 309 n. 3 (1st Cir.1986) (describing the *Colorado River* doctrine as "a fourth category of abstention").

piecemeal litigation;  and (4) the order in which the fora obtained jurisdiction.  *See id.* at 818, 96 S.Ct. at 1246-47.  In *Moses H. Cone Mem'l Hosp. v. Mercury Constr.,* 460 U.S. 1, 19, 23-26, 103 S.Ct. 927, 938, 941-42, 74 L.Ed.2d 765 (1983), the Court reaffirmed the "exceptional-circumstances" test of *Colorado River* and mentioned additional factors, including: (5) whether state or federal law will be applied;  and (6) the adequacy of the state court to protect the parties' rights.  The *Moses H. Cone* Court also stated that it found "considerable merit" in the idea "that the vexatious or reactive nature of either the federal or the state litigation may influence the decision whether to defer to a parallel state litigation under *Colorado River*."  460 U.S. at 18 n. 20, 103 S.Ct. at 938 n. 20. Other courts have held that federal removal policy bars a plaintiff whose initial suit is pending in state court from filing the same suit against the same defendant in federal court.  *See, e.g., Am. Int'l Underwriters (Philippines), Inc. v. Continental Ins. Co.,* 843 F.2d 1253, 1260-61 (9th Cir.1988).

A district court evaluating the *Colorado River* "exceptional-circumstances test," *see Moses H. Cone,* 460 U.S. at 19, 103 S.Ct. at 938, must be mindful that the specific factors enumerated in *Colorado River* and *Moses H. Cone* are not exclusive, *see Fox v. Maulding,* 16 F.3d 1079, 1082 (10th Cir.1994);  *Travelers Indem. Co. v. Madonna,* 914 F.2d 1364, 1367 (9th Cir.1990);  *Interstate Material Corp. v. City of Chicago,* 847 F.2d 1285, 1288 (7th Cir.1988), and that

> the decision whether to dismiss a federal action because of parallel state-court litigation does not rest on a mechanical checklist, but on a careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction.  The weight to be given to any one factor may vary greatly from case to case, depending on the particular setting of the case.

*Moses H. Cone,* 460 U.S. at 16, 103 S.Ct. at 937.  Accordingly, the district court must weigh all relevant considerations "in a pragmatic, flexible manner with a view to the realities of the case at hand."  *Moses H. Cone,* 460 U.S. at 21, 103 S.Ct. at 940.

A district court's refusal to defer to a state court is not immediately appealable under 28 U.S.C. § 1291 or 28 U.S.C. § 1292(a)(1). *See Gulfstream Aerospace Corp. v. Mayacamas Corp.,* 485 U.S. 271, 108 S.Ct. 1133, 99 L.Ed.2d 296 (1988).[26] A district court's refusal to defer to a state court *is* ultimately reviewable on appeal from final judgment, however. *See, e.g., Legal Econ. Evaluations, Inc. v. Metropolitan Life Ins. Co.,* 39 F.3d 951, 956 (9th Cir.1994); *TransDulles Cent., Inc. v. USX Corp.,* 976 F.2d 219, 224 (4th Cir.1992); *Schneider Nat'l Carriers, Inc. v. Carr,* 903 F.2d 1154, 1156-1158 (7th Cir.1990); *Hartford Acc. & Indem. Co. v. Costa Lines Cargo Servs., Inc.,* 903 F.2d 352, 360 & n. 7 (5th Cir.1990).

We review for abuse of discretion a district court's decision not to defer to a state court under the *Colorado River* doctrine. *See Gov't Employees Ins. Co. v. Simon,* 917 F.2d 1144, 1148 (8th Cir.1990). Under this standard, a district court will be reversed if it has "made a clear error of judgment, or has applied an incorrect legal standard." *SunAmerica Corp. v. Sun Life Assur. Co. of Can.,* 77 F.3d 1325, 1333 (11th Cir.) (citations omitted), *cert. denied,* --- U.S. ----, 117 S.Ct. 79, 136 L.Ed.2d 37 (1996). Although abuse of discretion is a relatively relaxed standard, *see Dopp v. Pritzker,* 38 F.3d 1239, 1253 (1st Cir.1994), it is "not a toothless one," *see McNeil v. Lowney,* 831 F.2d 1368, 1373 (7th Cir.1987). Review for abuse of discretion implies neither that the district court's judgment is unreviewable, *see Moses H. Cone,* 460 U.S. at 19, 103 S.Ct. at 938, nor that this

---

[26]In ruling that a district court's refusal to defer to a state court pursuant to the *Colorado River* doctrine was not immediately appealable under 28 U.S.C. § 1291, which provides for appeals from "final decisions of the district courts," the *Gulfstream Aerospace* Court ruled that the refusal is "inherently tentative" and thus is not a conclusive determination, as required by the first element of the three-pronged test established by *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 468, 98 S.Ct. 2454, 2458, 57 L.Ed.2d 351 (1978). *See* 485 U.S at 277-78, 108 S.Ct. at 1137. Notably, the Supreme Court did not address whether the denial of a motion to stay or dismiss an action pursuant to the *Colorado River* doctrine meets the third prong of the *Coopers & Lybrand* test: whether the order is "effectively unreviewable on appeal from a final judgment." *Gulfstream Aerospace,* 485 U.S. at 276-78, 108 S.Ct. at 1137 (citing *Coopers & Lybrand,* 437 U.S. at 468, 98 S.Ct. at 2458).

court "may merely rubber-stamp a district judge's discretionary determinations," *Dopp,* 38 F.3d at 1253. Accordingly, in certain circumstances, a district court's decision not to defer to the state court pursuant to the *Colorado River* doctrine will constitute an abuse of discretion. *See Microsoftware Computer Sys. v. Ontel Corp.,* 686 F.2d 531 (7th Cir.1982) (holding that the district court abused its discretion in refusing to stay a federal diversity action pending the outcome of an identical state court suit, where the state court suit was filed first and there was no indication that the state courts could not fully and fairly resolve the parties' dispute), *overruled on other grounds, Gulfstream Aerospace Corp. v. Mayacamas Corp.,* 485 U.S. 271, 108 S.Ct. 1133, 99 L.Ed.2d 296 (1988).[27]

B.

Although the first,[28] second,[29] third,[30] and sixth[31] factors enumerated *supra* do not apply and

---

[27]Likewise, in affirming district courts' decisions to defer to state courts, courts of appeals have implied that such deference was mandatory, not permissive, in light of the particular circumstances involved. *See, e.g., Am. Int'l Underwriters (Philippines), Inc. v. Continental Ins.,* 843 F.2d 1253, 1260 (9th Cir.1988) ("[I]t is clear that the rationale that prohibits plaintiffs from removing cases to federal court under 28 U.S.C. § 1441 also *bars* AIU from bringing this repetitive lawsuit in federal court.") (emphasis added); *Levy v. Lewis,* 635 F.2d 960, 966 (2d Cir.1980) ("[I]n the special circumstances of this case, sound judicial administration *requires* refraining from exercising concurrent jurisdiction.") (emphasis added).

[28]Neither the federal court nor the South Carolina court has assumed jurisdiction over property.

[29]Whether the federal forum is inconvenient depends "on the physical proximity of the federal forum to the evidence and witnesses." *Am. Bankers Ins. v. First State Ins.,* 891 F.2d 882, 885 (11th Cir.1990). The federal court, like the South Carolina court, was close to the relevant evidence and witnesses.

[30]In *Colorado River,* the Court ruled that deference to the state court's water rights proceedings was appropriate in light of the McCarran Amendment, 43 U.S.C. § 666, which expressed a federal policy against piecemeal litigation because it allowed the United States to be joined as a party in state court actions regarding water rights. *See* 424 U.S. at 819-20, 96 S.Ct. at 1247-48. One could argue that the district court, by hearing Mrs. Lops's ICARA petition, promoted piecemeal litigation because the South Carolina court had before it Mr. Lops's divorce and custody complaint, as well as Mrs. Lops's ICARA petition. Unlike the McCarran Amendment, however, ICARA, does not express a Congressional intent against piecemeal litigation. Thus, the piecemeal litigation factor does not weigh strongly in favor of deferring to

the fifth factor ordinarily would weigh in favor of assuming jurisdiction,[32] all other relevant considerations compel the conclusion that the district court abused its discretion by failing to defer to the South Carolina court. First, Mrs. Lops's federal suit was "reactive," *see Moses H. Cone,* 460 U.S. at 18 n. 20, 103 S.Ct. at 938 n. 20, because Mrs. Lops was motivated to file in federal court by an adverse decision of the South Carolina court. *See infra* Part III.C. Second, Mrs. Lops's federal suit was an attempt to circumvent federal removal policy, *see* 28 U.S.C. § 1441(a), because it was identical to her ICARA petition pending in the South Carolina court. *See infra* Part III.D. Courts of appeals that have addressed these two considerations have found them to be relevant to the *Colorado River* analysis, either as independent elements of the fourth *Colorado River*

the South Carolina court.

[31]Under *Moses H. Cone,* the inadequacy of state court proceedings may counsel against deferring to the state court. *See* 460 U.S. at 26, 103 S.Ct. at 942. The mere *adequacy* of state court proceedings, however, does not counsel *in favor of* deferral. *See Noonan S., Inc. v. County of Volusia,* 841 F.2d 380, 382 (11th Cir.1988). Here, as the majority concedes, both the South Carolina court and the federal district court "adequately could protect the parties' rights." Accordingly, the sixth factor is rendered neutral. *See Villa Marina Yacht Sales, Inc. v. Hatteras Yachts,* 947 F.2d 529, 536 (1st Cir.1991).

[32]Mrs. Lops's ICARA petition is based on federal law, and the presence of federal-law issues weighs against surrendering jurisdiction to state courts. *See Moses. H. Cone,* 460 U.S. at 26, 103 S.Ct. at 942. This factor, however, is of less significance where, as here, *see* 42 U.S.C. § 11603(a), the federal law in question grants concurrent jurisdiction to state and federal courts, *see Moses H. Cone,* 460 U.S. at 26, 103 S.Ct. at 942 (stating that "the source-of-law factor has less significance here than in [*Will v. Calvert Fire Ins. Co.,* 437 U.S. 655, 98 S.Ct. 2552, 57 L.Ed.2d 504 (1978) ], since the federal courts' jurisdiction to enforce the Arbitration Act is concurrent with that of the state courts"). Moreover, courts of appeals have upheld district court decisions to defer jurisdiction to state courts *even on questions of federal law* where the plaintiff's federal suit is repetitive of the plaintiff's state suit, *see LaDuke v. Burlington N. R.R. Co.,* 879 F.2d 1556, 1561 (7th Cir.1989) (affirming the district court's decision to defer to the state court where the federal plaintiff had brought the same suit initially in the state court and had not dismissed the state case; noting that the state and federal actions were both FELA suits over which state and federal courts exercise concurrent jurisdiction), or otherwise implicates *Colorado River* factors, *see Am. Disposal Servs., Inc. v. O'Brien,* 839 F.2d 84, 86-88 (2d Cir.1988) (affirming the district court's dismissal of a federal civil rights complaint because, *inter alia,* the state court proceedings were farther advanced).

factor—namely, the order in which the fora obtained jurisdiction—or as separate *Colorado River* factors in their own right.[33] In light of these considerations and the fact that the South Carolina court already has held hearings on the merits of the ICARA petition, *see infra* Part III.E, I believe that "wise judicial administration," *Colo. River,* 424 U.S. at 818, 96 S.Ct. at 1246 (quotation omitted), counsels that we vacate the district court's judgment and direct the district court to stay Mrs. Lops's federal action, *see infra* Part III.F.

C.

Courts must apply the fourth *Colorado River* factor, like all of the factors, "in a pragmatic, flexible manner with a view to the realities of the case at hand." 460 U.S. at 21, 103 S.Ct. at 940. Although "priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions," *Moses H. Cone,* 460 U.S. at 21, 103 S.Ct. at 940, courts also should consider "the vexatious or reactive nature of either the federal or the state litigation," *Id.* at 18 n. 20, 103 S.Ct. at 938 n. 20. Indeed, the First,[34] Second,[35] Fifth,[36]

---

[33]*Compare Gonzalez v. Cruz,* 926 F.2d 1, 4 (1st Cir.1991) (analyzing both considerations as elements of the fourth *Colorado River* factor), *with Telesco v. Telesco Fuel & Masons' Materials, Inc.,* 765 F.2d 356, 363 (2d Cir.1985) (considering "vexatious or reactive nature" of litigation to be a separate *Colorado River* factor), *and Am. Int'l Underwriters,* 843 F.2d at 1260-61 (deeming circumvention of federal removal policy to be a separate factor).

[34]*See Elmendorf Grafica, Inc. v. D.S. Am. (East), Inc.,* 48 F.3d 46, 50, 53 n. 4 (1st Cir.1995); *Gonzalez v. Cruz,* 926 F.2d 1, 4 (1st Cir.1991); *Villa Marina Yacht Sales, Inc. v. Hatteras Yachts,* 915 F.2d 7, 15 (1st Cir.1990), *appeal after remand,* 947 F.2d 529, 534 (1st Cir.1991); *Fuller Co. v. Ramon I. Gil., Inc.,* 782 F.2d 306, 309-10 (1st Cir.1986).

[35]*See Telesco v. Telesco Fuel & Masons' Materials, Inc.,* 765 F.2d 356, 363 (2d Cir.1985).

[36]*See Allen v. La. State Bd. of Dentistry,* 835 F.2d 100, 105 (5th Cir.1988).

Seventh,[37] Eighth,[38] Ninth,[39] and Tenth[40] Circuits all have stated explicitly that the "reactive" character of a federal suit weighs in favor of deferring to the state court under the *Colorado River* analysis.

On December 2, the South Carolina court informed the parties that it planned to place the children with Mr. Lops's mother, subject to an adequate security bond, during the pendency of the ICARA proceedings. On December 3, Mrs. Lops filed a motion to reconsider this matter in the South Carolina court, and, *on the same day,* she filed an identical ICARA petition in the federal district court. This timing leaves little doubt that Mrs. Lops's federal court suit was a reaction to what she viewed as an unfavorable custody decision by the South Carolina court.[41]

In my opinion, the district court should have viewed the reactive nature of Mrs. Lops's suit to be an important consideration in favor of deferring to the South Carolina court. Substantial precedent from other circuits supports this view. *See Villa Marina Yacht Sales, Inc. v. Hatteras Yachts,* 947 F.2d 529, 534 (1st Cir.1991) (stating that the district court did not err in counting "the

---

[37]*See Medema v. Medema Builders, Inc.,* 854 F.2d 210, 213 (7th Cir.1988); *Calvert Fire Ins. Co. v. Am. Mut. Reins. Co.,* 600 F.2d 1228 (7th Cir.1979), *cited in Moses H. Cone,* 460 U.S. at 17 n. 20, 103 S.Ct. at 938, n. 20.

[38]*See Federated Rural Elec. Ins. Corp. v. Ark. Elec. Cooperatives, Inc.,* 48 F.3d 294, 299 (8th Cir.1995).

[39]*See Nakash v. Marciano,* 882 F.2d 1411, 1417 (9th Cir.1989).

[40]*See Fox v. Maulding,* 16 F.3d 1079, 1082 (10th Cir.1994).

[41]Information contained in Mrs. Lops's request for attorney's fees confirms the causal relationship between the South Carolina's oral custody ruling of December 2 and Mrs. Lops's immediate decision to file suit in federal court. *See* Invoice of John L. Creson attached to Christine Lops's Motion for Attorney Fees and Costs, January 22, 1998, at 5-6 ("12/2/97 ... Telephone conference with Judge Nuessle's office; Telephone conference with client and Linda Gardener re: same.... Telephone conference with Dan Butler and Dave Thelen re: possible order returning child to grandmother and district court suit; Receipt and review draft U.S. District court suit.").

motivation factor against retaining jurisdiction" where the district court found that the plaintiff's decision to switch to federal court stemmed from the plaintiff's unsuccessful effort to obtain a preliminary injunction in the state court); *Nakash v. Marciano,* 882 F.2d 1411, 1417 (9th Cir.1989) (affirming the district court's decision to stay the federal action; stating that the plaintiff's attempt to avoid the state court's adverse rulings by filing suit in federal court weighed strongly in favor of deferring to the state court); *Allen v. La. State Bd. of Dentistry,* 835 F.2d 100, 105 (5th Cir.1988) (affirming the district court's stay where the sequence of events indicated that the plaintiff's federal suit was "vexatious and reactive"); *Fuller Co. v. Ramon I. Gil., Inc.,* 782 F.2d 306, 309-10 (1st Cir.1986) (applying the *Colorado River* factors in the declaratory judgment context; affirming the district court's dismissal, in part due to displeasure at the practice of filing a federal action in reaction to an adverse ruling in the state court); *Telesco v. Telesco Fuel & Masons' Materials, Inc.,* 765 F.2d 356, 363 (2d Cir.1985) (affirming the dismissal of a federal suit filed by a state court plaintiff; stating that deference to the state court is appropriate where the same party is the plaintiff in both courts and sues in the federal court on the same cause of action after suffering some failures in the earlier state court action); *see also Redner v. City of Tampa,* 723 F.Supp. 1448, 1454 (M.D.Fla.1989) (adopting the Magistrate Judge's recommendation and dismissing the case because, *inter alia,* the plaintiff's federal action was "reactive" to the state court decision).

The majority relies on the fact that the district court believed that it could resolve the case more quickly than the South Carolina court.[42] The district court, however, apparently did not fully consider the inevitable, time-consuming procedural tangle created by allowing the same case to proceed in two separate fora. Moreover, even if the district court reasonably believed that it could

---

[42]The majority points to no evidence indicating that the district court actually considered the reactive nature of Mrs. Lops's federal suit in reaching its determination not to defer to the state court.

resolve the issue more efficiently than the state court, the district court should have required Mrs. Lops to move to dismiss her state court action *before* the district court proceeded to evaluate the merits of the case. Allowing Mrs. Lops to litigate both the state and federal actions simultaneously was plainly contrary to "wise judicial administration." *Colo. River,* 424 U.S. at 818, 96 S.Ct. at 1246 (quotation omitted); *see LaDuke v. Burlington N. R.R. Co.,* 879 F.2d 1556, 1561 (7th Cir.1989) (affirming the district court's decision to defer to the state court where the plaintiff brought the suit initially in state court and then, without dismissing the state case, filed the same action in federal court).

D.

In my view, the district court also erred by failing to recognize that Mrs. Lops's federal suit effectively constituted removal to federal court by a state court *plaintiff,* a result contrary to federal removal policy. *See Am. Int'l Underwriters (Philippines), Inc. v. Continental Ins. Co.,* 843 F.2d 1253, 1260-61 (9th Cir.1988). Even though "priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions," *Moses H. Cone,* 460 U.S. at 21, 103 S.Ct. at 940, a repetitive federal suit counsels in favor of deferring to the state court *even if* the federal action is filed when the state court proceeding is still in its initial stages. *See LaDuke v. Burlington N. R.R. Co.,* 879 F.2d 1556, 1561 (7th Cir.1989).[43]

---

[43]In *LaDuke,* the Seventh Circuit affirmed the district court's decision to defer the exercise of jurisdiction even though the state court assumed jurisdiction only shortly before the plaintiff filed the same suit in federal court. 879 F.2d at 1561. The court concluded:

> The state action apparently did not make a great deal of progress prior to the filing of the federal action.... However, it is important to note in considering this factor in this case that Mr. LaDuke filed both the state action and the federal action. It was his choice to file in state court first. It was also his choice not to dismiss the state action after he commenced the federal action.... [T]he relevant *Colorado River* factors strongly support the district court's decision not to exercise jurisdiction over Mr. LaDuke's federal action....

According to the federal removal statute, 28 U.S.C. § 1441, only defendants have the right to remove cases from state to federal court:

> Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the *defendant or defendants,* to the district court of the United States....

28 U.S.C. § 1441(a) (emphasis added). The Supreme Court has held that the predecessor to 28 U.S.C. § 1441, 28 U.S.C. § 71, was intended to eliminate the plaintiff's removal right. *See Shamrock Oil & Gas Corp. v. Sheets,* 313 U.S. 100, 104-09, 61 S.Ct. 868, 870-72, 85 L.Ed. 1214 (1941); H.Rep. No. 1078, 49th Cong., 1st Sess. 1 (1887)("[I]t is believed to be just and proper to require the plaintiff to abide his selection of a forum."), *quoted in Shamrock Oil,* 313 U.S. at 106 n. 2, 61 S.Ct. at 871 n. 2. Likewise, the Ninth Circuit has held that 28 U.S.C. § 1441 "reflect[s] a Congressional intent that a plaintiff should not be permitted to alter the forum that it selects to litigate its claim against a particular defendant". *See Am. Int'l Underwriters,* 843 F.2d 1253 at 1261; *see also Diaz v. Sheppard,* 85 F.3d 1502, 1505 (11th Cir.1996) (ruling that 28 U.S.C. § 1441 must be construed narrowly, with doubt construed against removal).[44]

Relying on *Shamrock* and its progeny,[45] the Ninth Circuit has concluded that a plaintiff who first sues in state court may not subsequently file the identical lawsuit in federal court. *See Am. Int'l*

---

*Id.*

[44]The only relevant difference between the statute examined in *Shamrock Oil* and the current removal statute, 28 U.S.C. § 1441, is that the old statute allowed plaintiff removal in circumstances involving local prejudice against the plaintiff. *See Am. Int'l Underwriters,* 843 F.2d at 1261 (citing 28 U.S.C. § 71). The current removal statute does not have even this limited right of removal. *See* 843 F.2d at 1261 (citing 28 U.S.C. § 1441).

[45]*See Or. Egg Producers v. Andrew,* 458 F.2d 382, 383 (9th Cir.1972) ("A plaintiff who commences his action in a state court cannot effectuate removal to a federal court even if he could have originated the action in a federal court and even if a counterclaim is thereafter filed that states a claim cognizable in a federal court."), *cited in Am. Int'l Underwriters,* 843 F.2d at 1260.

*Underwriters,* 843 F.2d at 1261 ("After considering the rationale set forth in the removal cases discussed above, we find that AIU should not be permitted to accomplish, by the *refiling* of its state court complaint, what would clearly be prohibited if AIU tried to *remove* to state court.")(emphasis in original).[46] Similarly, the First,[47] Second,[48] and Seventh[49] Circuits all have counseled against exercising federal jurisdiction in cases where a plaintiff whose state court case is still pending files the same suit in federal court.[50]

---

[46]*See also In re Pac. Enters. Secs. Litig.,* 47 F.3d 373, 376 (9th Cir.1995) (reasserting the rule of *Am. Int'l Underwriters* that a plaintiff "may not file a lawsuit in state court and then file the same suit in federal court"); *accord Fed. Deposit Ins. Corp. v. Nichols,* 885 F.2d 633, 637-38 (9th Cir.1989)(stating that removal policy was not relevant where the state suit was no longer pending when the plaintiff filed the federal action).

[47]*See Gonzalez v. Cruz,* 926 F.2d 1, 4 (1st Cir.1991) (stating that the filing of a second lawsuit by the same plaintiff may weigh against the exercise of federal jurisdiction, especially where the plaintiff was attempting to circumvent removal policy); *Villa Marina Yacht Sales, Inc. v. Hatteras Yachts,* 915 F.2d 7, 14 (1st Cir.1990) ("Other courts faced with second lawsuits brought by the same plaintiff have considered that factor relevant in upholding district court decisions to dismiss the federal case."), *appeal after remand,* 947 F.2d 529, 536 (1st Cir.1991) (stating that removal policy was not relevant where the plaintiff first dismissed a defendant from the state suit and then sued that defendant in federal court).

[48]*See Telesco v. Telesco Fuel & Masons' Materials, Inc.,* 765 F.2d 356, 363 (2d Cir.1985) (affirming the dismissal of the federal suit filed by a state court plaintiff; stating that deference to the state court is appropriate where the same party is plaintiff in both courts and sues in the federal court on the same cause of action after suffering some failures in the earlier state court action).

[49]*See LaDuke v. Burlington Northern R.R. Co.,* 879 F.2d 1556, 1561 (7th Cir.1989) (affirming the district court's decision to defer to the state court where the federal plaintiff had brought the same suit initially in state court and had not dismissed the state case). *But see Votkas, Inc. v. Cent. Soya Co., Inc.,* 689 F.2d 103, 107-08 (7th Cir.1982) (affirming the district court's decision not to stay a federal diversity action where the plaintiff previously had filed an identical suit in state court in the state where the district court sits).

[50]*See also Lorentzen v. Levolor Corp.,* 754 F.Supp. 987, 993 (S.D.N.Y.1990) (staying the federal proceeding in light of, *inter alia,* the plaintiff's attempt "to change his original choice of forum in violation of the federal policy against plaintiff removal and forum-shopping"); *Ryder Truck Rental v. Acton Foodservices Corp.,* 554 F.Supp. 277, 281 (C.D.Cal.1983) ("Having elected state court, plaintiff should be bound by its choice absent compelling reasons to seek relief in another forum."); *Ystueta v. Parris,* 486 F.Supp. 127, 128-29 (N.D.Ga.1980) (stating

I find this reasoning compelling. Accordingly, I would hold that where a plaintiff's state court case is still pending, the plaintiff presumptively may not file the *identical* suit against the *identical* defendant in federal court. I therefore believe that the majority's ruling undermines the purpose of federal removal policy.[51]

Under certain limited circumstances, a district court may be justified in exercising jurisdiction even though the federal plaintiff originally filed the same suit in state court and the state action is still pending. For example, consider a plaintiff who files suit in state court and then, upon being advised by the state court that no hearing on the case would occur for a year, moves in state court to dismiss. If the state court refuses to dismiss the action, the plaintiff should be able to seek relief in federal court despite the pendency of the state court action.

No such extenuating circumstances existed here, however. Mrs. Lops filed suit in district court without first moving to dismiss her state court case. Despite the fact that the district court reached a final judgment on the merits of Mrs. Lops's ICARA petition on December 22, 1997, it was not until the *middle of January of 1998* that Mrs. Lops moved to dismiss her state court action, and even then she did not comply with the timing requirements of the South Carolina court. *See* South Carolina court's Order of January 27, 1998, at 2 (stating that Mrs. Lops's motion to dismiss was filed "within 48 hours" of the South Carolina court's substantive ICARA hearing on January 16, 1997, in plain violation of the court's "requisite 5 day notice requirement"). In my view, the district court

that this circuit's precedents permit a district court to stay a federal suit that is substantially duplicated by a pending state action between the same parties); Note, "Federal Court Stays and Dismissals in Deference to Parallel State Court Proceedings: The Impact of *Colorado River*," 44 U. Chi. L.Rev. 641, 666-67 (1977) (stating that the federal removal statute arguably expresses a policy determination limiting plaintiff to initial forum, "counterbalanc[ing] the obligation to exercise jurisdiction in the subsequent repetitive lawsuit").

[51]The majority points to no authority suggesting the propriety of removal by a state court plaintiff to a federal court.

should not have allowed Mrs. Lops to continue to litigate the same action in both fora. By failing

to require Mrs. Lops to move to dismiss her state court action, the district court condoned Mrs.

Lops's abuse of the state and federal court systems.[52] *Cf. Villa Marina Yacht Sales, Inc. v. Hatteras*

*Yachts,* 947 F.2d 529, 536 (1st Cir.1991) (stating that federal removal policy was not relevant where

the plaintiff first dismissed a defendant from the state suit and then sued that defendant in federal

court); *Fed. Deposit Ins. Corp. v. Nichols,* 885 F.2d 633, 637-38 (9th Cir.1989)(stating that federal

removal policy was not relevant where the state suit was no longer pending when the plaintiff filed

the federal action).[53]

E.

The *Colorado River* inquiry, governed by considerations of "wise judicial administration,"

must give "regard to conservation of judicial resources." *Colo. River,* 424 U.S. at 818, 96 S.Ct. at

1246 (quotation omitted). Accordingly, in reviewing the district court's refusal to defer pursuant to

*Colorado River,* we must take into consideration the totality of circumstances at the time of our

decision, *not* simply the situation at the time the district court refused to stay the state court action.

*See Schneider Nat'l Carriers, Inc. v. Carr,* 903 F.2d 1154, 1156 n. * (7th Cir.1990); *Lumen Constr.,*

*Inc. v. Brant Constr. Co., Inc.,* 780 F.2d 691, 697 n. 4 (7th Cir.1985); *Bd. of Educ. of Valley View*

---

[52]Counsel for Mr. Lops made this very argument to the district court on December 12, 1997. *See* R3: 12 ("If, in fact, Ms. Lops wanted to be in front of the federal court she has a remedy. All she has to do is dismiss her case, but she hasn't done that. In fact, she is still filing motions in the South Carolina case....").

[53]The majority seeks to justify Mrs. Lops's attempt to circumvent federal removal policy on the grounds that Mr. Lops and his mother were the "original forum shoppers" because they "first tried to forum shop this case away from the German courts, where [Mrs. Lops] had initiated custody proceedings." Such equitable considerations regarding antecedent proceedings in other courts are entirely inapplicable in the *Colorado River* analysis. Our sole inquiry should be whether the district court's deferral to the South Carolina court was required by principles of "wise judicial administration." *Colo. River,* 424 U.S. at 818, 96 S.Ct. at 1246 (citation omitted).

*Community Unit School Dist. No. 365U v. Bosworth,* 713 F.2d 1316, 1321-22 (7th Cir.1983). For example, if the state court action remains in its preliminary stages by the time this court is ready to resolve the federal case on appeal, the fourth *Colorado River* factor would weigh in favor of affirming the district court's decision not to defer to the state court. *See United States v. Adair,* 723 F.2d 1394, 1400-07 (9th Cir.1984).

Likewise, if the state court action has proceeded significantly by the time the federal case reaches us on appeal, then we must take this change of circumstances into account, as well. *See Ill. Bell Tel. Co. v. Ill. Commerce Comm'n,* 740 F.2d 566, 569-71 (7th Cir.1984) ("The purpose of the *Colorado River* doctrine, however, is the conservation of state and federal judicial resources. Where the progress of the state suit has changed significantly since the motion to stay the federal suit was filed, it would defeat that purpose to ignore the subsequent events."). The South Carolina court already has assumed jurisdiction over Mrs. Lops's ICARA petition and, more important, has held its substantive hearings regarding the merits of her petition. Because the South Carolina court is thus poised to issue a ruling in this matter, the factor of "how much progress has been made in the two actions," *Moses H. Cone,* 460 U.S. at 21, 103 S.Ct. at 940, does not weigh against deferring to the South Carolina court.

F.

Although the fact that Mrs. Lops's state and federal cases pose questions of federal law ordinarily would weigh against deferring to the South Carolina court, *see Moses H. Cone,* 460 U.S. at 23-26, 103 S.Ct. at 941-42, I believe that the reactive nature of Mrs. Lops's federal suit and Mrs. Lops's circumvention of federal removal policy compel this court to vacate the district court's judgment and direct it to stay Mrs. Lops's federal action. To hold otherwise would be to condone litigation practices completely at odds with "wise judicial administration." *Colo. River,* 424 U.S.

at 818, 96 S.Ct. at 1246 (quotation omitted).

The reactive nature of a federal suit and the circumvention of federal removal policy are *independent* elements of the *Colorado River* analysis.[54]  In this case, Mrs. Lops's federal ICARA petition was *both* reactive *and* in violation of federal removal policy.  The relevant factors thus weigh quite heavily in favor of deferring to the South Carolina court, *see Telesco v. Telesco Fuel & Masons' Materials, Inc.,* 765 F.2d 356, 363 (2d Cir.1985) (stating that deference to state court is appropriate where the same party is plaintiff in both courts and sues in the federal court on the same cause of action after suffering some failures in the earlier state court action), regardless of the fact that federal law is at issue in both proceedings, *see LaDuke v. Burlington N. R.R. Co.,* 879 F.2d 1556, 1561 (7th Cir.1989) (affirming the district court's decision to defer to the state court where the federal plaintiff had brought the same suit initially in the state court and had not dismissed the state case;  noting that the state and federal actions were both FELA suits over which state and federal courts exercise concurrent jurisdiction).  Because Mrs. Lops's actions constituted a sufficiently flagrant abuse of the concurrent system of jurisdiction accorded to state and federal courts under ICARA, *see* 42 U.S.C. § 11603(a), I conclude that the district court abused its discretion by failing to defer to the South Carolina court.  Only by vacating the district court's judgment and directing it to stay Mrs. Lops's federal action can this court ensure that litigation practices in this circuit remain consistent with "wise judicial administration." *Colo. River,* 424 U.S. at 818, 96 S.Ct. at 1246 (quotation omitted).

---

[54]Because some reactive federal suits are brought by dissatisfied state court defendants, not all reactive federal suits involve the circumvention of federal removal policy.  *See, e.g., Nakash v. Marciano,* 882 F.2d 1411, 1417 (9th Cir.1989).  Similarly, not all federal lawsuits brought by state court plaintiffs in violation of federal removal policy are reactive to adverse state court rulings;  some such federal lawsuits simply are attempts to achieve two bites at the judicial apple.

IV.

In my view, the Full Faith and Credit Act, 28 U.S.C. § 1738, required the district court to accept the Georgia court's determinations that venue and personal jurisdiction were lacking in Georgia. Even if the district court was not precluded from hearing the case, however, I would hold that the district court abused its discretion by failing to stay the case in deference to the South Carolina court. To rule otherwise not only undermines the authority of the courts of Georgia to issue binding judgments, but also condones Mrs. Lops's egregious manipulation of ICARA's system of concurrent jurisdiction.

Therefore, I respectfully dissent.